FRED A. HALL *vs.* CHICAGO, BURLINGTON & NORTHERN RAILROAD COMPANY.

July 1, 1891.

Railway—Engineer Injured in Collision—Negligence—Assumption of Risk.—Plaintiff, a locomotive engineer of one of defendant's passenger trains, was injured by a collision of his train with freight-cars which a switching crew were running on the main track, on the time of plaintiff's train, contrary to the rules of the company.     *Held,* that, upon the evidence, it was a question for the jury whether plaintiff was guilty of contributory negligence in not keeping a proper lookout for obstructions on the track; also that plaintiff did not assume the risks incident to such negligent obstruction of the track by other employes, merely because he entered defendant's service with knowledge that they might be negligent

| | |
|---|---|
| 46 | 439 |
| 54 | 385 |
| 46 | 439 |
| 84 | 171 |

in that respect, and that the company had adopted rules regulating the conduct of engineers for the purpose of preventing, as far as possible, collisions in such cases.

**Same — Failure of Engineer to Obey Rule, when not Negligence.—** If compliance with a general rule is rendered impossible by other and inconsistent orders given by the master to his servant, negligence cannot be imputed to the servant for not following the general rule.

**Same—Extent of Care Required of Passenger Engineer.—** The court refused to instruct the jury that it was plaintiff's duty, as engineer of a passenger train, to use the utmost human care and foresight for the safety of his train, but instructed them that he owed the defendant the duty of exercising ordinary care and diligence in the performance of his duty,— that is, such care as persons of ordinary prudence would exercise, under the same circumstances; that whether plaintiff exercised that degree of care was to be determined in view of all the circumstances, such as the liability to danger at the time, the nature and extent of the danger, and the consequences that might be expected to result from a want of care; that the care must be commensurate with the risks of the situation. *Held*, that this correctly stated the rule of law applicable to the case.

**Same—Damages.—** The verdict *held* not so excessive as to warrant this court in saying that it was the result of passion, prejudice, or any corrupt motive.

Appeal by defendant from an order of the district court for Ramsey county, *Wilkin*, J., presiding, refusing a new trial on plaintiff consenting that the verdict (of $40,133.33) be reduced to $25,000.

*Young & Lightner*, for appellant.

*Harvey E. Hall, John A. Lovely*, and *Davis, Kellogg & Severance*, for respondent.

MITCHELL, J.    This was an action to recover damages for personal injuries sustained by plaintiff while in defendant's service as a locomotive engineer of a passenger train.    The injuries were the result of a collision between plaintiff's train and some freight-cars on defendant's main track, between Dayton's Bluff and Oakland station; and a somewhat full statement of the facts is necessary to a proper understanding of the case.    The plaintiff was employed in running the regular suburban passenger train between the Union Depot, in St. Paul, and Pullman avenue, a distance of 10.18 miles,

the first station south of the Union Depot being Dayton's Bluff, a distance of 1.75 miles, and the next Oakland, the further distance of 1.88 miles. These trains were and always had been run on schedule time, the one on which plaintiff was injured leaving, according to the time-table, Union Depot at 9:30, Dayton's Bluff at 9:38, and Oakland at 9:43 P. M. Immediately south of Dayton's Bluff station there is a short curve, but beyond that, south, the track is straight almost down to Oakland. The main track is the westerly or riverward one, and east of it are several parallel side tracks. About 2,160 feet south of the curve referred to there is a cross-over from the adjacent side track to the main track, and 2,150 feet south of the cross-over is the switch-frog, at which the collision occurred. There is one switch-stand at the cross-over and another 86 feet south of the frog, governing the switch to which the frog belongs. These switch-stands are surmounted by the usual lights, which show a white light up and down the track when set for the main track, and a red light when the switch is open. A car standing partly on the main track and partly on the side track would hide the light from an engineer coming down from Dayton's Bluff. The defendant's yard, as defined by its rules, extends 3,000 feet south from the south switch, which would carry it down almost to Oakland, although the land between Dayton's Bluff and Oakland is really out in the country, and uninhabited, the defendant's road being there built through a marsh. In railroad parlance, "station" or "station limits" includes "yard."

The defendant had promulgated certain rules for the government of its employes, the most material provisions of which are as follows:

"All trains and engines within the limits of Savanna, East Dubuque, Grand Crossing shops, and St. Paul yards will be subject to the orders of the yard-masters. Switching engines will work daily at these stations inside yard limits, as shown by signal boards. All trains must approach these yards under full control.

"All trains are required to reach the extreme limits of and to pass through all stations completely under control. Speed must be reduced, and the engineer and trainmen must commence to get their train in hand at least one-half mile from a station, so that under no

circumstances whatever shall it be possible for it to strike any train, car, or engine which may be inside the limits of the station. The entire responsibility for safety rests with the approaching train. All engines must pass switches cautiously, and engineers must be sure they are right before passing them."

Trains were classified on the time-tables with regard to their priority of right to the track. Trains of the first class (to which plaintiff's train belonged) were superior to those of the second and all succeeding classes. All trains not classified on the time-tables were known as "extra," or "wild" trains, and were required to keep entirely out of the way of all regular trains, of whatever class, clearing the time of such regular trains at least 10 minutes if passenger, and 5 minutes if freight, trains. Trains of a superior class had the absolute right of the track over all trains of an inferior class. Working trains in all cases to clear the time of passenger trains at least 10 minutes.

"Should any freight or irregular train, at any time, be compelled to occupy the main track at a station or elsewhere within the time of any passenger train, the conductor of such train must immediately send out a flagman to warn the approaching train."

Another rule provided that, when the track was obstructed by accident or from any other cause, the conductor should immediately protect his train, either by going back himself, or sending a competent flagman, with danger signals, (a red lantern and torpedoes by night,) to a point not less than 20 telegraph poles (2,000 feet) distant from the rear end of his train, and until he reached a point where his danger signals could be seen not less than a quarter of a mile by the engineer of an approaching train, where he should place one torpedo on the rail, then move back one telegraph pole, and there remain until the expected train arrived, or until he is recalled by the whistle of his own engine.

On the night in question, which was rather dark, the plaintiff's train, consisting of an engine, baggage, smoking, and two passenger coaches, left the Union Depot on schedule time, (9:30 P. M.,) and also left Dayton's Bluff station on time, (9:38,) running at the usual rate of speed, 18 or 20 miles per hour. Plaintiff sat looking down the

track out of the left-hand or easterly side of the cab, and after passing the curve.referred to, just south of Dayton's Bluff station, saw both switch-stands giving a white light, showing that the switches were set for the main track.    There was no danger signal, nor anything to indicate that there was any obstruction on the track.    In this situation of things, and after he had passed the cross-over, and, as he says, when he was within 600 or 700 feet from the frog where the accident occurred, his attention was attracted by the noise of the injector on the fireman's side of the engine, which had "broke" its work, which caused him to turn round and watch the fireman setting the injector at work again.    The principal question of fact contested on the trial was as to the length of time the plaintiff ceased his lookout, and watched the fireman fixing the injector.    This, and the propriety or necessity.of his ceasing his lookout at all, are really the most important questions in this case.    The plaintiff's testimony is that he was thus occupied not over 10 or 12 seconds, during which his train ran not to exceed 300 feet.    While the fireman estimates the time it took him to fix the injector at about "a minute," yet his testimony corroborates that of plaintiff, that the whole thing occupied a very short space of time.    The defendant's counsel argues that the evidence shows that the plaintiff must have ceased his lookout at least a minute, during which his train would have run 1,500 or 1,600 feet.    This conclusion is arrived at by an estimate of the length of time which it would have taken for the occurrence of the successive events which he assumes took place after plaintiff ceased his lookout and before he resumed it.    Not only is this mode of reasoning largely conjectural, but in this case we think the counsel is not entirely accurate in his assumption as to what did occur intervening these points of time.    The estimates of witnesses as to the lapse of time are very unreliable, especially where, as in this case, the time is, at most, very brief, and different events follow each other in rapid succession.    Some persons will estimate at a few seconds what others will estimate at as many minutes. The general tendency, under such circumstances, is to overestimate the lapse of time.    In our judgment, all the circumstances indicate that defendant's calculation is an overestimate;

and, while that of plaintiff may be somewhat of an underestimate, yet the evidence was such as to justify the jury in concluding that it was approximately correct. At any rate, it is evident that the space of time referred to was exceedingly brief, as it appears that the collision occurred only about two minutes after plaintiff left Dayton's Bluff. When plaintiff resumed his lookout he instantly saw that the switch light was obscured, (indicating that there were cars between him and it.) He also saw, right in front of his engine, and in the act of getting out of its way, a man swinging a lantern. He immediately did everything in his power to stop his train, but, being then within 250 or 300 feet of the frog, the distance was so short that a collision was inevitable.

The cause of the collision was as follows: A switching crew had left a string of freight-cars on the main track, just north of the switch, from about 8 o'clock in the evening. Within four or five minutes of the time of plaintiff's train, the person in charge of the switching crew sent an engine, with two cars attached, out on the main track to bring in these freight-cars. This engine first ran south on the main track far enough to clear the switch, which was then set for the main track. It was evidently after this was done that the plaintiff, while on the lookout before the injector broke, saw the white lights. The engineer of the switch-engine then backed up north on the main track, and coupled on the freight-cars referred to, and then went south far enough to let the rear of these cars clear the switch. During all this time the switch was set for the main track, and, of course, would continue to show a white light up and down the track. After the freight-cars had thus cleared the switch, the brakeman in charge of the switch signaled the engineer to stop, and then opened the switch to enable him to back in on the side track. It is fairly inferable from the evidence that it was before this was done that plaintiff's attention was directed to the injector. Immediately upon receiving the signal, the engineer of the switch-engine, who was evidently working as rapidly as possible, stopped and commenced to back in on the side track. As soon as the rear of the freight-cars entered upon the side track, it would hide the switch-light from one coming down the main track from the north. It was

evidently at this juncture of affairs that plaintiff resumed his look-out, and first saw the danger. It should also be added that, when the switch-engine started to go out on the main track, the person in charge of the switching crew, in response to the protests of the engineer, promised to signal plaintiff's train, and started for that purpose, with a lantern, up north along-side of the string of freight-cars. This was the last that was seen of him by any of the switching crew, and it does not appear, except from the evidence of the plaintiff, how far he got. He was undoubtedly the man whom they saw swinging a lantern immediately in front of their engine, then within 300 feet of the switch. In view of the very brief space of time that intervened, it is evident that he could not have gotten far enough to give the signal required by defendant's rules, or indeed to give any sufficient signal, even in the absence of all rules on the subject. Everything tends to the conclusion that he never got more than some 300 feet beyond the frog, and only got there an almost inappreciably short space of time before plaintiff's train arrived.

1. Defendant's first point is that the evidence does not show that it was guilty of any negligence or failure of duty towards the plaintiff. The statement of facts is a sufficient answer to this proposition. The conduct of the switching crew in using the main track for switching purposes, right on the time of plaintiff's train, and in plain violation of the company's rules, was negligence of the grossest kind, which might almost be characterized as wanton and criminal. The plea that this was purged or relieved of all negligence by the act of the person in charge of the switching crew signaling plaintiff's train with a lantern is not warranted by the facts. As has been already said, it does not appear that he ever gave any adequate signal. On the contrary, it is almost conclusively demonstrated by the evidence that he could not have done so.

2. The contention that plaintiff voluntarily assumed all the risks resulting from the negligence of other employes of the company in violating its rules is equally untenable. The line of argument advanced in support of this position is, in substance, that, inasmuch as plaintiff was advised by certain rules that other employes might violate other rules, and obstruct the main track at a forbidden time,

and that rules were adopted in view of such a contingency, so that, as far as possible, a collision could not happen without a concurrent violation of rules by two sets of employes, therefore plaintiff assumed all the risks resulting from such causes. It is a plain proposition that it does not require any rules to advise a person that other employes of the master, or the master himself, may be guilty of acts of negligence. Common experience tells every man that this is so. Consequently defendant's proposition, reduced to plain terms, is that, inasmuch as every person who enters the service of another knows that his master or his fellow-servants, however careful ordinarily, are liable to commit negligent acts, and as he voluntarily enters the service with knowledge of that fact, therefore he assumes all the risks liable to result from such causes. To state such a proposition is to refute it. While it is the law that a person assumes all the open and visible risks incident to the employment in which he engages, and of which he had knowledge when he entered upon his service, yet it would be pressing this principle beyond all reason or authority to attempt to carry it to the extent contended for by the defendant. To do so would be, in effect, to hold that the servant assumes all risks, known or unknown, which could possibly result from any conceivable future act of negligence on part of the master.

3. The next point urged is that plaintiff was himself guilty of contributory negligence in not reducing the speed of his train while running through the yard, so as to have it "completely under control," as required by the rule; which counsel claims means that the speed must not be greater than that at which the engineer can stop his train within the distance that he can see danger ahead. This rule, like many of the others, does not command the doing or not doing of a particular specific act, but is one calling for the exercise of judgment and diligence on part of the engineer, and must be construed in that view, and considered in connection with the other rules of the company, and the other duties and responsibilities imposed upon engineers. It would seem that the construction which plaintiff himself put upon this rule is a reasonable one; that is, that he should have his train so under control that he could stop it before reaching the danger point, if the proper signals were seasonably given him.

But even if the rule, if standing by itself, might mean what defendant claims, yet, as to plaintiff, it was clearly modified by the schedule of time according to which these trains were required to be run, and were actually run, presumably with the knowledge and at the direction of the defendant's governing officers. The plaintiff could not conform to the time-table, and at the same time keep his train "under complete control" in the sense in which defendant claims that term is used in the rules. If compliance with a general rule is rendered impossible by other and inconsistent orders given by the master to his employe, negligence cannot be imputed to the employe for not following the general rule. *Pennsylvania Co.* v. *Roney,* 89 Ind. 453.

4. It is finally urged that it was negligence *per se* for plaintiff to cease his lookout, even temporarily, for the purpose of looking at the injector. To our minds this is the only debatable question in the case. It is argued that the rules of the company required engineers to keep a constant lookout while running through yard limits, and that if plaintiff had done so in this case he would have seen the red light on the switch-stand when set to let in the freight-cars on to the side track, and would also have sooner discovered that this light was obscured, and likewise have sooner discovered the waving of the lantern, and thus have been able to avoid the collision. It may be conceded that the evidence shows that if plaintiff had kept a constant lookout he would have discovered these indications of danger a very few moments earlier than he did, and consequently have been able to slow his train a little sooner, so as to have at least diminished somewhat the injurious consequences of the collision; also that there was no actual necessity for his watching the fireman fix the injector. It will be observed, however, that the rule nowhere expressly requires engineers to keep a constant lookout. Counsel merely claims that it is implied from the rule as he construes it. But it is evident that it cannot be construed as absolutely and inflexibly requiring engineers to keep a constant lookout, under all circumstances; for, as they have the general care and supervision of their engines, it is evident that circumstances might frequently occur which would require them to give their attention temporarily

to other things besides looking out. As has been already remarked, the rule must be construed as imposing upon engineers duties calling for the exercise of judgment and diligence, and calling their attention specifically to the exercise of that care which the law would impose on every engineer even in the absence of rules. Moreover, the plaintiff saw the white lights advising him that the switches were all right and set for the main track. He also knew that he was running on his own time, and had the absolute priority of right to the track over all other trains. So far from having any reason to suppose that the main track was then being used for switching, he had reason to suppose that, in conformity to the rules, all such trains had been removed at least 10 minutes before. While, of course, he had no right to rest blindly upon the assumption that others would obey the rules, without taking reasonable precautions to protect his own train, yet the fact that he had no reason to suppose that the track had been obstructed by the culpable negligence of others has an important bearing upon the question whether he was guilty of negligence in turning his attention momentarily to the disabled injector. As a matter of fact, we have no doubt that 19 out of every 20 engineers would have done precisely the same thing under like circumstances; and whether plaintiff was guilty of contributory negligence in so doing was, upon the evidence, a question of fact for the jury, and not of law for the court. *Lake Shore, etc., Ry. Co.* v. *Parker,* 131 Ill. 557, (23 N. E. Rep. 237.) The trial court, therefore, properly refused to give defendant's seventh instruction to the jury.

5. The defendant also takes exception to the court's instructions, and refusals to instruct, as to the degree of care which plaintiff was required to exercise. The court was requested to instruct the jury that it was plaintiff's duty, as engineer of a passenger train, to exercise the utmost human care and foresight to avoid a collision between his train and any obstruction on the track, and if he failed to exercise the utmost human care and foresight, and such failure contributed to the collision in which he was injured, he could not recover. The court refused to give this, but did instruct the jury, in substance, that a railroad company owes to its employes the duty of

exercising ordinary care and diligence in protecting them from injury while engaged in the course of their employment; that this duty is reciprocal, and that the employe owes the company the duty of exercising ordinary care and diligence in the performance of his duty; that ordinary care is such care as persons of ordinary care and prudence would exercise under the same circumstances; that the question whether a person has exercised such ordinary care is to be determined in view of all the circumstances; that what would be ordinary care under certain circumstances might be great carelessness under different circumstances; that the jury were to determine from the evidence what was the situation of affairs at the time of this transaction, and then to say whether, in that condition of affairs, the plaintiff exercised such care as a person of ordinary care and prudence would have exercised; that this required the jury to consider the liability to danger at the time, the nature, character, and extent of the danger, and the more or less disastrous consequences that might be expected to result from a want of care. "*The care must be commensurate with the risks of the situation.*"

The argument of defendant's counsel is that, as a railway company owes to its passengers the "highest degree of care," and as it can only do this through its employes, therefore the employes engaged in running passenger trains owe the highest degree of care to the company. This sounds very plausible, but, if the position be sound, it is rather strange that the text-writers and decided cases all lay down the rule exactly as stated by the trial judge in this case; and, so far as we can discover, the proposition insisted on by counsel has never before been advanced, except in the case of *Locke* v. *Sioux City & Pacific R. Co.*, 46 Iowa, 109, where it was very promptly overruled. If the employe owes the highest degree of care to the employer because the latter owes that degree of care to its passengers, it is difficult to see why, on the same reasoning, the employer does not owe the same degree of care to its employes. But the question is not one of duty between carrier and passenger, but between employer and employe, and we have no doubt the law was correctly stated by the trial judge. Moreover, at least as applied to this case, the assumed distinction between the "highest care" and

"ordinary care" was a mere abstraction, without any practical value. Indeed, it is a serious question whether the law has not been unnecessarily confused by the attempted distinction between different degrees of care and of negligence. In doing so the words "care" and "negligence" are merely used with epithets attached which no one has ever been able satisfactorily to define. When we have said that the degree of care to be exercised in a given case depends on circumstances, and must be commensurate to the situation, we have expressed, in general terms, the whole law on the subject. In determining what degree of care they will exercise in a given case, prudent, careful men take into account the risks to be apprehended, the value of the thing intrusted to them, and its liability to injury. As railway companies, in transporting passengers, use powerful and dangerous instrumentalities, and have intrusted to them the most valuable of all things,—human lives,—which are more liable to be destroyed in case of accident than inanimate property, therefore we say they must exercise the highest degree of care, which simply means that they must take all these things into account, and, in the language of the court below, exercise a degree of care "commensurate with the situation." Had the trial judge told the jury that the plaintiff was bound to exercise the highest degree of care, and then attempted to define what that meant, we fail to see how he could have used any more appropriate language than he did in defining what he termed "ordinary care." The plaintiff's own life was in greater danger from a collision than those of the passengers in the coaches in the rear, and what a prudent engineer would naturally do to protect his own life would certainly fulfil the requirements of duty to the company or to its passengers.

6. The jury awarded the plaintiff $40,143.33 damages, and upon defendant's motion for a new trial upon the ground, among others, that the damages were excessive, the court required the plaintiff, as a condition to denying a new trial, that he reduce his verdict to $25,-000, which he did. It is claimed that this is still excessive, and that the original verdict was so much so as to indicate that it was rendered under the influence of passion and prejudice, and therefore the court erred in not setting it wholly aside. If a verdict is so mani-

festly excessive as to show that it was rendered through passion or prejudice, the only safe rule is to set it aside altogether, at least in all cases where the evidence is conflicting, and the merits of the case doubtful; for it cannot be told but that this same passion or prejudice controlled the jury in finding on the other issues in the case. *Craig* v. *Cook*, 28 Minn. 232, (9 N. W. Rep. 712.) But, while the verdict in this case is one of the very largest ever rendered in this state in a personal injury case, yet we find nothing in the record to indicate that it was the result of any passion or prejudice or undue influence. It is not a pleasant task to describe the terrible injuries which this plaintiff sustained, or the untold agony and suffering which he has endured, and which he will probably continue, to a considerable extent, to endure during life. He was an able-bodied young man, capable of earning a good income from his profession. He is now an almost helpless cripple and invalid for life. Life to him will hereafter be a burden rather than a pleasure. His heroic conduct in staying at his post of duty and hazarding his own life, in order to save the lives of his passengers, may have so commended itself to the jury that they awarded him somewhat more damages than they otherwise would, but we fail to discover anything indicating that they were actuated by passion, prejudice, or any corrupt motive. Neither do we construe the action of the trial judge in cutting down the verdict as expressive of an opinion that the jury were influenced by any such improper motives, but simply that he thought that, however great the injuries, there must be some limit to the amount of pecuniary compensation awarded, and that in this case the jury had exceeded that limit. Although the verdict is still very large, yet we can see no good reason for our interfering with it on that ground.

Order affirmed.