(118 So. 565)

**LOUISVILLE & N. R. CO. v. JACOBSON.**
**(6 Div. 989.)**

Supreme Court of Alabama. Oct. 18, 1928.

Rehearing Denied Nov. 22, 1928.

London, Yancey & Brower and Frank Bainbridge, all of Birmingham, for appellee.

McClellan & Stone, of Birmingham, for appellant.

charged in the complaint is that an unknown agent, servant, or employee "negligently caused or negligently allowed said switch to be and remain open." The argument is untenable. Plaintiff's testimony was to the effect that the signal given was an assurance that the switches were all right, and from the testimony the jury could infer that it was the duty of the "herder" to see that the switches in the yard were all closed before giving the signal to proceed with the train from the station. Birmingham Ry. Co. v. Baylor, 101 Ala. 488, 13 So. 793; L. & N. R. R. Co. v. Elliott, 166 Ala. 419, 52 So. 28. But, in addition, there was evidence that just previously a freight train numbered first seventeen had left this side track, and that it was the duty of the conductor of that train to see that upon leaving said track the switch was closed. Speaking to this phase of the evidence, witness Matthews, conductor of the train on which plaintiff was engineer, states:

"It is the duty of the man who pulled out of there to close that switch. If he went off and didn't close it he was negligent."

The switch was not locked, but was thrown, "latched down and left red." The jury could reasonably infer from the evidence that those in charge of train first seventeen negligently left the switch open. Authorities, supra. The mere fact, therefore, that plaintiff makes reference to the signal of the "herder" could in no manner affect the probative force of the testimony tending to show the duty of the "herder" as well also of the conductor of train first seventeen to see to it that this switch was closed.

■ It is not insisted there is here involved any question of assumption of risk, as it is well understood that, while the employee assumes the ordinary risks of the employment, he does not assume a risk created by the employer's negligence. Bierley v. Shelby Iron Co., 208 Ala. 25, 93 So. 829.

■ But the second theory for the affirmative charge rests upon the alleged contributory negligence on plaintiff's part. "The rule is well established that, under the Federal Employers' Liability Act, if the injury resulted 'in whole or in part' from defendant's negligence, the cause of action is established, and that contributory negligence on the part of the employee is not a bar to recovery, but to be considered in mitigation of damages only. Plaintiff's negligence, contributing with defendant's negligence, in the production of the injury, does not defeat the cause of action, but only lessens the damages." Davis v. Sorrell, 213 Ala. 191, 104 So. 397.

■ It is recognized by the courts, however, that, if plaintiff's negligent act was the sole cause of the injury, there could be no recovery, for, as said in Ill. Cent. R. R. Co. v. Skaggs, 240 U. S. 66, 36 S. Ct. 249, 60 L. Ed. 528:

GARDNER, J. On the morning of March 20, 1924, Charles Jacobson, appellee here, as engineer of the appellant railroad company on its Pan-American train, ran into an open switch in the Montgomery yards, colliding with a freight train then at rest on the switch line track, the force of the collision throwing his head against the cab and producing "a bump" on the back of his head. There was no abrasion of the skin, and the swelling gradually disappeared in the course of a week or ten days, and he continued on his run that day and with his work for practically a month thereafter, when he lost his position.

Jacobson insists that, while the blow on his head gave no outward indication that he had suffered any injury of any consequence, and while he did not know he was in fact in any manner seriously hurt, and made no complaint to that effect, yet that it developed the blow had in reality seriously affected both his eyesight and hearing so as to incapacitate him for further work of that character. Thereupon, on February 17, 1925, he instituted this suit against appellant railroad company under the Federal Employers' Liability Act (volume 44, pt. 1, U. S. Stat. at Large, p. 1442; 45 USCA §§ 51–59) for the recovery of $25,000 damages, and upon the trial recovered a judgment for the full amount sued for, from which judgment the defendant has prosecuted this appeal.

■ Appellant argues error in the refusal of the affirmative charge requested on its behalf upon two theories: First, upon the theory that plaintiff in his testimony rests for recovery upon a negligent signal of the yard "herder" to proceed, while the negligence

"It may be taken for granted that the statute does not contemplate a recovery by an employé for the consequences of action exclusively his own; that is, where his injury does not result in whole or in part from the negligence of any of the officers, agents or employés of the employing carrier or by reason of any defect or insufficiency, due to its negligence, in its property or equipment."

To like effect is Grand Trunk W. Ry. Co. v. Lindsay, 233 U. S. 42, 34 S. Ct. 581, 58 L. Ed. 838. This principle was recognized and given application by this court in So. Ry. Co. v. Peters, 194 Ala. 94, 69 So. 611, but it cannot be here applied under the evidence in this record.

■ Defendant charges plaintiff with negligence in the operation of the train through the yards in violation of the following rule of the company: "Trains must approach the junction of the H. & N. and S. & N. yard under control, expecting to find main track occupied"—insisting that he proceeded through the yards at too high a speed and without the train being under control. The engine of train second seventeen was standing with headlight burning (it was about 5 a. m. o'clock, dark and raining) on the sidetrack 426 feet from the switch. After leaving the main line and through the open switch, plaintiff ran his train these 426 feet into the engine of second seventeen, producing the collision, the subject-matter of this litigation.

It is the contention of the defendant that the above-cited rule was applicable, and that, had plaintiff operated the train under control, ample opportunity for stopping and preventing a collision would have been afforded. But conceding, for the purpose of this argument only, that plaintiff was guilty of contributory negligence, under the undisputed proof, such negligence on his part could not have been the sole cause of the collision—this for the reason that negligence on defendant's part is indisputably shown by the switch negligently left open. "It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the Act." Grand Trunk R. R. Co. v. Lindsay, supra. And, as said by the court in Ill. Cent. R. R. Co. v. Skaggs, supra:

"If the injury was due to the neglect of a coemployé in the performance of his duty, that neglect must be attributed to the employé; and if the injured employé was himself guilty of negligence contributing to the injury the statute expressly provides that it 'shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé.'"

That defendant's negligent act was a "part of the causation" and in fact the foundation thereof, clearly appears from the undisputed proof, and any negligence on plaintiff's part contributing thereto is to be considered by way of diminution of the damages only, and not as a bar to a recovery.

The foregoing reasons, as applicable to the refusal of the affirmative charge, in connection with the authorities cited, serve also to justify the trial court in the refusal of those charges requested by defendant which constitute assignments of error 7 and 15.

■■ Charges refused to defendant, constituting assignments of error 8, 9, 10, 11, 12, 13, and 14, lay stress before the jury of the rule of defendant, hereinabove set out, and plaintiff's duty in regard thereto. They omit any reference to the consequences growing out of such violation, whether in bar of the suit or by way of diminishing the damages. We are therefore of the opinion these charges had a misleading tendency sufficient to justify their refusal. In any event, however, an examination of charges given at defendant's request, as appear on pages 16 to 18, inclusive, of the record, disclose that the substance of these refused charges was well embraced in those given for defendant.

Assignments of error 3, 4, 5, and 6 relate to the refusal of charges requested by defendant, the effect of which would exclude plaintiff's recovery of any damages on account of any impairment of his sight or hearing.

■ Plaintiff testified to his age as 63 years. Subsequent to plaintiff's injury, his eyes were examined by two specialists—one Dr. Gunter of Albany, Ala. (now Decatur), who had known him for years and had prescribed glasses for him a number of times; the other, Dr. Constantine who has been engaged in his practice in Birmingham as an eye specialist since 1908. These specialists both agree that plaintiff was suffering with senile cataract in both eyes, and they did not think it possible for this condition to have been produced by a blow on the back of the head. "The scientific world regards the cause of senile cataracts as a more or less physiological change in the lense. The lense changes many times all through life, and this goes a little too far and causes an opacity in the lense. There is a tendency along this line as you begin to approach advanced age. * * * I don't see how it would be possible for the condition I found Mr. Jacobson's eyes to be caused by a blow inflicted on his head, back f his head striking the cab, making a small knot the size of a hen egg and not breaking the skin." Dr. Constantine (page 64). "I don't see how a blow on the back of a man's head could possibly cause a cataract on his eye." Dr. Gunter (page 57). Upon cross-examination, they each testify there is what is known as traumatic cataract, caused, as the name implies, from an injury, but each insisted that such an injury must be to the eyeball—"either a puncture or blow on the eye." A standard medical authority was exhibited indicating that a traumatic cataract may be produced by concussion, which Dr. Constantine inter-

preted in further testimony to mean a concussion of the eyeball, and that the author had no reference to a concussion of the brain. Dr. Gunter did not so explain, but seemed to think the expression in the medical authority was at variance with his view in that respect.

Appellant contends that these experts, testifying after examination of plaintiff, deposed to facts and not mere opinions, and that their evidence, being without dispute in this particular, must be considered conclusive, citing Bennett v. Fail, 26 Ala. 605, referred to approvingly in Odom v. State, 174 Ala. 4, 56 So. 913.

We are of opinion, however, that Bennett v. Fail, supra, could only be authority to the extent that the testimony that plaintiff was suffering with cataracts was a statement of a fact, but even that authority does not go to the length of holding such statement binding and exclusive. In any event, however, the producing cause of the cataract was clearly a matter of expert opinion, and it has been the settled rule in this jurisdiction that opinion evidence of this character is not binding and conclusive on the jury, so as to require an acceptance thereof as a matter of law. Robinson v. Crotwell, 175 Ala. 205, 57 So. 23; Birmingham Ry. Co. v. Sloan, 199 Ala. 268, 74 So. 359; S.-S. S. & I. Co. v. Bearden, 202 Ala. 220, 80 So. 42; Cent. of Ga. Ry. Co. v. Clements, 2 Ala. App. 520, 57 So. 52.

Moreover, plaintiff testified that prior to the injury he had suffered impairment in neither sight nor hearing, but immediately following both had become impaired and sometimes has pains or aches in his eyes. Birmingham Ry. Co. v. Sloan, supra. Dr. Gunter stated that such a blow on the head might affect the hearing.

We are of the opinion there was no error in the refusal of these charges, and that the given charges on pages 18 and 19, touching these matters, gave defendant all to which it was entitled.

Upon the question of contributory negligence, defendant insists, as previously noted, that plaintiff ran the train from the station and through the yards at too great a speed, and in violation of defendant's rule hereinabove quoted. Plaintiff states his speed was 15 miles per hour when his train headed into the switch, but supposed he had reduced it to 5 miles per hour when the collision occurred.

Plaintiff testified he did not know he was off the main line, though there is evidence tending to show a noticeable lurch of a train as it moves from one track onto another. Plaintiff was familiar with the yards, and worked as engineer for defendant on the South and North Division for 25 years, and for the past 2 years and 3 months had pulled the Pan-American, a north-bound train and No. 3 south bound. He was familiar with the board standing on the right of the track coming out of the station and just as the main line is reached, upon which was the following: "All trains reduce speed, expecting main track to be occupied"—and another board of like character just across the trestle on the other side of the track. He was familiar with the rule requiring that "trains must approach the junction of the H. & N. and S. & N. yards under control, expecting to find main track occupied," and further testified that a train is under control when it can be stopped in half the distance of the engineer's vision.

It is insisted, however, that this rule is inapplicable here for the reason that the "junction" therein referred to had been passed when the open switch was reached. But the testimony of those familiar with the rule and its practical operation give it a broader interpretation. Speaking of the rule and the operation of trains thereunder, the conductor of plaintiff's train states:

"We operated the train under control going through the yard limits. * * * It applies to all trains. * * * We must proceed through yard limits expecting to find the main line blocked, and with the train under control, so we can stop in one half our vision."

Asked the reason, he stated:

"In case switches are wrong, or some one in the yard had overlooked a switch, or left a cut of cars on the main line and prevent an accident."

Hudson, engineer of second seventeen, with which was the collision, testifies to like effect, saying:

"That don't apply only to H. & N. and S. & N. yard. It applies to all of them. In this part of the yard especially you have to do a lot of switching * * * you can go down there any time of day or night and find switching. Nine times out of ten you will find this switching. * * * The curve is on his left. He has got to come around there with his train under control, expecting to find those switches wrong, anything wrong. By under control, I mean about six or eight miles an hour where you can stop in one or two car lengths; where you can stop if you see anything wrong."

The testimony of these witnesses is to the further effect that a signal from the "herder" does not alter the rule, and, if the schedule calls for higher speed, any lost time must be made up after leaving the yards.

Plaintiff's testimony is in agreement with the foregoing as to his duty under this rule to approach the switches with his train under control. Being asked the question, "You knew it was your duty to approach those switches in that yard with your train under control?" he answered, "I knew it." Question: "Just like that rule says?" Answer: "Yes."

That competent witnesses may "explain or construe the rules of the company in ordinary everyday practice," is well established by the authorities. 22 Corpus Juris, p. 548, and note.

In view of defendant's insistence upon plaintiff's contributory negligence in the operation of the train through the yards, the inquiry as to whether or not the train was operated under· control on this occasion was a very material one. John Matthews, conductor on the train, as witness for defendant, testified that at the time the train went into the side track its speed was 15 miles per hour, and that it was traveling at about the same speed at the moment of collision. He was then asked: "Was that train under control going at the speed it was going when it left the main line, as it pulled into the switch, within the meaning of that rule?" Plaintiff interposed objection on the ground "this man is not an engineer, irrelevant, incompetent and immaterial," and to the action of the court in sustaining the objection, defendant duly excepted. Matthews was 66 years of age, and had been working for defendant company 45 years. He was the conductor on this train of which plaintiff was engineer. He states:

"I have had other railroad experience than the operation of trains. I was for eighteen years in yard duty at Boyles and Birmingham; I was master of trains. He is supposed to have entire charge of the yards."

He then testified as to the yards at Montgomery where the accident occurred and entire familiarity therewith and with reference to the map introduced in evidence. He was standing in the aisle of one of the coaches as he felt the train give a "little lurch * * * thinking it was changing tracks." Immediately following the collision he went to where the engines were, and he examined the switch, saw that the switch was thrown and latched and was red. The train had gone on the side track all except a portion of one coach.

Considering the long years of experience of this witness in railroad operation as above outlined, his familiarity with the yards and surroundings, his immediate examination of the situation, and his familiarity with the rules of the company and speed of the train on this occasion, we are of the opinion he was competent to answer whether or not on this occasion the train was being operated under control within the meaning of the company's rule. 22 Corpus Juris, 546–548; N. Ala. R. R. Co. v. Shea, 142 Ala. 110, 37 So. 796; A. C. L. R. ·R. Co. v. Enterprise Cotton Co., 199 Ala. 57, 74 So. 232.

It appears that before the objection could be interposed and ruled upon the witness had given a negative reply, but the subsequent ruling of the court sustaining the objection to the question was in practical effect an exclusion thereof, and very clearly so understood by the jury. The suggestion, therefore, that, if there was error, it was without injury, is without merit.

As we have previously stated, under the facts as here presented, any contributory negligence on plaintiff's part could not operate as a bar to a recovery. It was important, however, under the federal statute, to be considered in diminution of the damages. The verdict of the jury was for the full amount sued for, which may be taken as an indication no weight was given by the jury to defendant's plea of contributory negligence on· plaintiff's part. The witness was of long experience in railroad work, and that the evidence was most material and relevant to the issue presented by the plea is apparent.

We are of the opinion the exclusion of this evidence was prejudicial to defendant, and constitutes error to reverse.

For the error indicated, let the judgment be reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and BOULDIN and ·FOSTER, JJ., concur.