ATCHISON, T. &. S. F. RY. CO. v. BALLARD.

No. 9161.

Circuit Court of Appeals, Fifth Circuit.

Jan. ·9, 1940.

Rehearing Denied Feb. 7, 1940.

McCORD, Circuit Judge, dissenting.

Thornton Hardie, of El Paso, Tex., for appellant.

Walker Saulsbury and Byron Skelton, both of Temple, Tex., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

When this case was here before,[1] it was on an appeal from a judgment on a verdict directed against appellant then, appellee now, on the ground that the primary cause of the "collision" was the negligence of plaintiff, in not operating his train at restricted speed, within the yard limits of the station at Hagerman.

On this appeal, the railway company, assigning other grounds too, still insists

[1] 5 Cir., 100 F.2d 162.

that the verdict should have been directed for it on that ground. We thought then, that the case was not one for a direction. We thought then, that since, under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., contributory negligence on the part of an employee, is not a bar to, but only diminishes recovery, the case was one for a jury verdict. Fully recognizing the laboring oar they pull, in endeavoring to have us reverse our former judgment, appellant yet vigorously maintains that; the case is one of an employee causing his own injury through direct violation of a positive, specific rule; and that within the authorities, his negligence must be considered the sole proximate cause of his injury, even though, the fireman was negligent in failing to keep a proper lookout. Unadilla Valley Railway Company v. Caldine, 278 U.S. 139, 49 S.Ct. 91, 73 L.Ed. 224; St. Louis Southwestern Railway Co. v. Simpson, 286 U.S. 346, 52 S.Ct. 520, 76 L.Ed. 1152; Van Derveer v. Delaware, L. & W. R. Co., 2 Cir., 84 F.2d 979; Paster v. Pennsylvania R. R., 2 Cir., 43 F.2d 908; Hylton v. Southern Railway Co., 6 Cir., 87 F.2d 393; Great Northern Railway Co. v. Wiles, Administrator, 240 U.S. 444, 36 S.Ct. 406, 60 L.Ed. 732; Miller v. Central R. Co. of New Jersey, 2 Cir., 58 F.2d 635; I.-G. N. R. R. Co. v. Lowry, 132 Tex. 272, 121 S.W.2d 585; Pere Marquette .R. Co. v. Haskins, 6 Cir., 62 F.2d 806.

█ We do not think so. Of the opinion that the case was one for a jury verdict upon whether there was negligence of the fireman, which concurred with that of the plaintiff, to cause the collision, we overrule appellant's assignment that a verdict should have been directed for it. Cf. Atlantic Coast Line R. Co. v. Stringfel-

low, 292 U.S. 625, 54 S.Ct. 630, 78 L. Ed. 1480.

The case stands differently, however, on appellant's assignments, that there was error, in the giving of objected to portions of the main charge, and in the refusal of defendant's requested charges. Separately assigned, as to particular charges asked and refused, and as to portions of the main charge given over appellant's objection, taken together, they present three main grounds of error. The first point presented in requested charges and in objections to the main charge, is, that appellant was entitled to its requested charge that plaintiff in violation of company rules 93 and D-153,[2] had, as engineer failed to have his train move while in the yard limits of Hagerman, at restricted speed, that is, "Proceed, prepared to stop short of train, obstruction or anything that may require the speed of a train to be reduced." The second point is, that under these rules, the members of the crew of Extra 1146-East, into the caboose of which plaintiff ran his train, were under no obligation to protect against it and therefore, could not be negligent with respect to plaintiff; and it was error to submit to the jury, whether or not, they were. A subordinate point under this main point is, that if the issue of the negligence of the crew of Extra 1146-East should have been submitted at all, it was not correctly submitted, in that the charge erroneously told the jury that there is a conflict between Rule 93 and Rule 99, when properly construed there is no conflict.

The third point is the more general one, that the Judge throughout his charge, failed to instruct the jury, as he should have done, that the violation by plaintiff of specific rules, such as Rules 93 and D-153, would of itself, constitute negligence,

---

[2] "93. Stations having yard limits will be designated by special rule in time table. Within yard limits all trains and engines may use main track, not protecting against second or third class trains or extra trains, but will give way as soon as possible upon their approach. All except first class trains will move within yard limits at restricted speed; the responsibility for accident with respect to second or third class trains rests with the approaching train."

"D-153. Within yard limits where current of traffic rules are in effect, all trains and engines may use main track

not protecting against trains shown in time table as second or third class or extra trains, but will give way as soon as possible upon their approach. All except trains shown in time table as first class will move within yard limits at restricted speed. The responsibility for accident with respect to second or third class or extra trains rests with the approaching train."

"Restricted speed—Proceed prepared to stop short of train, obstruction or anything that may require the speed of a train to be reduced."

and further the charge did not properly advise the jury as to the weight to be attached to the rules, that is, as to their force and effect.

We think appellant is right. It is true, that a violation of company rules for the conduct of its employees, general in terms, will not ordinarily constitute negligence as matter of law. Nor will observance of such rules, as matter of law, necessarily be due care, but it will be for the jury to say, considering the rules along with the evidence as a whole, whether there was negligence. Gildner v. B. & O. R. Co., 2 Cir., 90 F.2d 635; Rocco v. Lehigh Valley R. R. Co., 288 U.S. 275, 53 S.Ct. 343, 77 L.Ed. 743; Miller v. Central R. Co. of New Jersey, 2 Cir., 58 F.2d 635; Hall v. Chicago B. & N. R. R. 46 Minn. 439, 49 N.W. 239. A violation of specific rules though, will constitute negligence just as their observance by others, will, in relation to the violator, constitute, due care. Miller v. Central R. Co. of New Jersey, and other cases, supra. Thus, as applied to the question at issue, if the rule for keeping the train at restricted speed had stopped there, without more, it would have left the matter greatly one of judgment and it would be a question of fact under the opinion of witnesses qualified to give opinions, whether in the particular case, there was negligence in failing to observe it. But, where as here, there is a precise definition of restricted speed, the question of what the rule means and requires, is a question of law for the court, and the evidence of plaintiff himself showing that the train was not proceeding at restricted speed within the definition, it was the duty of the court to say so, and to instruct the jury; that plaintiff was himself negligent in violating the rule of restricted speed; and that if the jury believed that that violation was the sole proximate cause of the injury, they should find a verdict for defendant. But, because of the issue made on the negligence of the fireman, it was also the duty of the court to instruct the jury, that if, on the other hand, they believed that the fireman was also negligent in not keeping a proper lookout, or in not properly advising plaintiff of the obstruction on the track, and this negligence concurred with plaintiff's negligence, they should award plaintiff recovery, but diminish the amount of it by such sum in proportion to the total injuries, as the negligence attributable to him bears to the negligence of the fireman.

Appellant, in charge after charge, requested the court to do this, and in addition, objected to the form of the general charge. This, instead of instructing directly upon the rule, as to restricted speed, its meaning and effect, that it had been violated, and that its violation was negligence, submitted to the jury, whether or not it had been violated, and whether, if it had been, the violation was negligent. Thus, there was error, in submitting an issue as to the legal effect of the violation of this rule when it was the duty of the court to direct the jury, that its violation by plaintiff would be negligence. And there was error too, in failing to instruct the jury that on the undisputed facts, plaintiff had violated it. It will not do, as appellee asks us to, to say, that the District Judge advised the jury as to the meaning of the rule in the terms of the rule itself, and that this was all appellant was entitled to have. For, appellant was entitled to have the jury instructed, not only as to the meaning of the rule and its binding effect, and that its violation was negligence, but also on the undisputed facts, that plaintiff had violated it.

Appellee devotes a large portion of its brief to the contention that while Rule 93 was offered in evidence, Rule D-153, which contains the definition of restricted speed, was not, and that when the District Judge charged the jury as to restricted speed in the language of the definition, he really gave appellant more than he was entitled to.

This will not do. The parties by a stipulation, not reasonably capable of any other meaning than that they were to be regarded as in evidence, agreed that the rules appellant pleaded (included in them were 93 and D-153 with the definition of restricted speed), were in force and governed the operation of defendant's trains involved in the action. The whole trial proceeded upon the theory that the rules were in evidence. No objection was taken by appellee to the charge of the court, treating the rules and the definition of restricted speed as in evidence, and it is too late now, for appellee to change front and contend that they were not, especially, since if the point that they were not in, had been made below, the omission could have, at once, been reme-

772

died. United States v. Atkinson, 297 U. S. 157, 56 S.Ct. 391, 80 L.Ed. 555; St. Paul Fire & Marine Ins. Co. v. Kaufman Compress Co., 5 Cir., 93 F.2d 156, 158.

Finally pointing to what we said in the opinion on the former appeal; that Rules 93 and 99 were in conflict and whether the crew of 1146-East were negligent in not protecting against S-46, plaintiff's train, was for the jury; and, "further, the rule requiring an engineer to operate his train at restricted speed within yard limits is very indefinite. If the jury believed the testimony of the engineer, they might have considered he was not negligent in this respect;" 100 F.2d page 164, and to the testimony of plaintiff on this trial that he was traveling at restricted speed; appellee insists that, under the rule of the law of the case, these were jury issues.

■■ We do not think so. The rule of the law of the case means that what was decided on the former appeal, is, if the evidence is the same on another trial controlling on the trial court, and on the appellate court on another appeal, unless on a re-examination, that court is convinced that the first decision was wrong. Messinger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152; State of Kansas ex rel. Beck v. Occidental Life Ins. Co., 10 Cir., 95 F.2d 935; Seagraves v. Wallace, 5 Cir., 69 F.2d 163; American Surety Co. v. Bankers' Savings & Loan Ass'n, 8 Cir., 67 F.2d 803. What was decided on the former appeal was this; on all the evidence in the record the case was clearly one for the jury and it was error to direct a verdict for defendant. With that decision we are in full accord. What was said in the course of the opinion; that Rules 93 and 99 were in conflict; that the jury had the right, to determine whether the crew of 1146-East were negligent; that the rule for running at restricted speed was very indefinite, and if the jury believed plaintiff's testimony that he was running at restricted speed, they could find that he was not negligent, in respect of the rule, was not necessary to the decision that the judgment should be reversed.

■■ A careful consideration of the evidence convinces us that the rule requiring an engineer to operate his train at restricted speed within yard limits, is, in the light of the definition in the rules not "very indefinite", but most definite;

that Rules 93 and D-153 are not in conflict with Rule 99, but complementary thereof. We think it quite plain too, that within the authorities, Little Rock & M. R. Co. v. Barry, 8 Cir., 84 F. 944, 43 L. R.A. 349; Southern Ry. v. Hylton, 6 Cir., 37 F.2d 843; they imposed a specific duty upon plaintiff to watch out for the train ahead, within the yard limits, and to so run his train, that he could stop it when necessary to avoid running into the train ahead. They imposed no duty on the train crew ahead to look out for him.

Rules 93 and D-153, both state positively "within yard limits, trains and engines may use the main track, not protecting against second or third class trains or extra trains * * * All except first class trains will move within yard limits at restricted speed. *The responsibility for accident with respect to second or third class trains rests with the approaching train.*" (Italics supplied). Then the rule defined restricted speed—"*Proceed prepared to stop short of train, obstruction or anything that may require the speed of a train to be reduced.*" (Italics supplied). A rule of similar purport covering movement of vessels in a fog, has been uniformly construed, as peremptory, its violation negligent, if a ship is at such speed as to be unable to stop within the distance other vessels can be seen. The Anna, 5 Cir., 297 F. 182, 184. Without any rule, the courts have held, that automobiles traveling where vision is obscured, must be kept at such speed, as to be able to stop within the distance within which an obstruction may be seen. Thompson v. City of Houma, 5 Cir., 76 F.2d 793; Sisson v. So. Ry. Co., 62 App.D.C. 356, 68 F.2d 403, 405; Northern Pac. Ry. Co. v. Bacon, 9 Cir., 91 F.2d 173; Smith v. Southern Ry. Co., 5 Cir., 53 F.2d 186; Brown v. Southern Ry., 5 Cir., 61 F.2d 399, 400.

Plaintiff's train was not a first class train but an extra. The rules were made to cover such trains as his. He knew, that Extra 1146-East was ahead of him and he knew that because of the curve, he would not be able to see a train standing at the station until within 1,000 ft. of it. Knowing all of this, instead of bringing his train to restricted speed, and proceeding under it, he, according to his own testimony, merely reduced it from the 25 miles per hour, at which he was traveling, down to an estimated 12 to 15 miles

per hour, a speed which according to his own testimony, would require, 1,400 to 1,500 ft., to stop in. Assuming that plaintiff's testimony as to the rate of speed at which he was running was true (though it hardly seems reasonable that a train running at only 12 or 15 miles per hour, could not be stopped by the application of the emergency, under 1,500 ft.), we think it is contrary to common sense to contend that the train when running in yard limits at a speed which requires 1,-500 ft., merely a third of a mile to stop in, was running at restricted speed under the rule. A verdict that it was, would we think, be wholly without support in the evidence.

In his testimony before the Board, given within two weeks after the accident, plaintiff, said that he knew that Hagerman was protected by yard limit boards; that he had passed the board over 4,000 feet before the collision; that he knew that under the yard limit rule he was required to move under restricted speed, "that restricted speed was to be able to stop short of any obstruction; and that he would have to admit that if he had lived up to the rule and had been handling his engine in yard limits at restricted speed, he would not have had the accident." On the trial, he undertook to avoid the effect of this testimony, saying that he was sick and in the hospital at the time he so testified. But, though he did say that he thought that he was traveling at restricted speed before the collision, he admitted, that though he saw the caboose 1,000 ft., before the point of collision, he was traveling at such a speed that he could not, even by the application of his emergency, stop before striking it. Excusing the speed at which he was going by saying, "I was going at such speed I couldn't stop because of the information of the fireman that the road was clear," he answered the question, "At any rate, you were going at such a high rate of speed that you could not stop before you hit the caboose?" "No Sir. I could not stop."

Questioned as to the time it would take to stop his train at the speed at which he was going just before and at the time of the collision, he said, "As I approached the double crossing, which was a mile and a half or a mile and a quarter from the station at Hagerman, I was running at about 25 miles per hour. I set the air and reduced the speed from about 25 miles per hour to about 12 or 15 miles per hour," he further said that running at 25 miles per hour, he could have stopped with air within 3,000 ft., or 3,500 ft., and with the emergency between 1,500 ft., or 2,000 ft., and that traveling at 12 or 15 miles per hour, with air, he could have stopped between 1,500 or 2,000 ft., and with the emergency around 1,400 ft."

It is thus perfectly plain that going at a speed which would require 1,400 ft. to make an emergency stop, he was not going at restricted speed within the definition of the rule, "Prepared to stop short of train, obstruction or anything that may require the speed of a train to be reduced."

■■■ We think it quite plain too, that Rules 93–99, are not in conflict with, but are complementary of, each other. Rule 99 is general, Rule 93 is particular. Rule 99 applies to every case except that dealt with in Rules 93 and D-153. Those rules control special cases. It was not necessary, therefore, for the crew of 1146-East, to put out signals, look out for or otherwise protect against Extra 1146, within the yard limits of Hagerman. The case did not come under Rule 99, providing: "When a train stops under circumstances in which it may be overtaken by another train," for under Rule 93 and D-153, there were no circumstances under which 1146-East might be overtaken by Extra S-41. The responsibility for avoiding a collision was on plaintiff's train and not on 1146-East. Its crew was expressly excused from protecting against the following train. It was error to submit the question of the negligence of its members to the jury.

For the errors indicated, the judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

Reversed and remanded.

McCORD, Circuit Judge (dissenting).

I do not concur in the majority opinion.

When this case was here before, 5 Cir., 100 F.2d 162, we said of rules 93 and 99, "Defendant's rules 93 and 99 are in conflict as applied to this case. * * *" I still adhere to that opinion. A cursory reading of these rules will show that they are in conflict and that without explanation they lack understanding. I am of opinion, however, that it is of no moment to pass upon or discuss these rules since the verdict should turn solely upon the testimony of the engineer, fireman, and conductor of Train 46-S, Ballard being the engineer of this

train. Only rules D-153 and 494 have any bearing on this case and they should be considered along with the evidence to arrive at a verdict.

The wreck occurred at the town of Hagerman, New Mexico, about 10:30 in the night time. W. Ballard, the plaintiff was severely injured. On the trial of the case he testified: "When I approached Hagerman about a mile or a mile and a half from the station, the track there makes about a two per cent curve; the curve begins about the double crossings and it extends beyond the station. It was a clear night, chilly and hazy down in the flat. I was sitting on my side of the engine with my hands on the control valve. The curve there is what is known as a 'fireman's curve'. I was on the outside of the curve. I had a conversation with the fireman at or about the double crossings. After I put the air on the train and reduced the speed I looked over at the fireman and said, 'How does it look around there?' He had his window shut; he opened his window and looked out, came back in with his head and said, 'It is clear'. He was riding upon his seat box there in the cab on the left hand side of the engine. I shoved my brake valve off, released the air, and let her drift on down on her own power. I had information the track was clear. My view was obscured from the curve; I couldn't see around there. The engineer is blinded and the fireman has a clear view. I relied on the information of the fireman. As I released my brakes and approached the station at Hagerman my speed held its own, just drifted along there, was not working any steam. When I first saw anything that indicated the switcher was there in front of the station was after we had come around on that portion of the straight track about 900 or 1,000 feet from the rear of that train. I saw the marker which is a red light on the right hand side; that is the caboose light burning bright red on the rear of the train. I did not see the left marker; it was not possible from my place in the engine to see. I was about 900 or 1,000 feet from the caboose when I first saw the marker. The caboose was about 1,000 feet from the station and towards me as I approached the station. My cab and boiler protruded ahead of me about 40 feet; it was the boiler of the engine that prevented me from seeing out to the left and upon the curve; it blinded my vision. When I saw the marker, I 'big holed' the train, put all the air I had under them, shut

off the drifting throttle, put on my sand, ran down in the gangway to look out to see whether he was moving or stopped dead still. I looked back and saw that the fireman had not shut off his fire; I shut it off; reached up and caught my whistle so it would not kill anbody. I had a car of gasoline four cars behind and I didn't want to burn anybody up. I stood behind the seat box and figured I would only get a jar, and I rode it right down in the collision. I didn't see the fireman. No sir, he wasn't there. The fireman from his side had a plain view; all he had to do was look across; nothing in his view to blind him; he had a straight view right out there; his view got better as we approached Hagerman. One riding on his side could have seen the caboose markers of that switcher that night and known what they were. The fireman and the brakeman did not tell me that night that they saw any caboose markers. I did not see the head brakeman that night after we left Artesia; he had gone forward to help the conductor with his report. We had about thirty cars on the train, averaged fifty feet."

Wallace W. Foster, the fireman, testified that he had been fireman for about thirteen years and had passed up and down the track at Hagerman fourteen or fifteen times. "There wasn't any doubt in my mind about them being marker lights, lights on the caboose; I thought they were too far to the left to be anywhere close to the tracks. The engineer did not ask me anything before the collision. If I had any doubt about the nature of those lights or had thought possibly they may have been on the main track, or might be marker lights, I would have called attention to the engineer. Well, it was only after we got on the curve before I saw anything that created any doubt in my mind; pretty close to it. I watched those lights and when we got a little bit further I saw they were caboose lights, then I hollered to the engineer to 'big hole' her; that is, put the brakes in emergency. I did this as soon as I recognized them. It didn't like much of being around the curve before I recognized them, the lights. It was just a few seconds after I knew what the lights were before I told the engineer to 'big hole' her; then I rode down and about three or four cars from the wreck I jumped off. I don't think we were going very fast then; the witness in the investigation said about ten miles an hour. I guess the yard limit there is about three quarters of a mile from the wreck. I did

not become acquainted with the lay out there at Hagerman very well; I thought I knew it pretty well but I. didn't. There is no curve up at the double crossings. Yes, I lost the line of the track up there. I was seated on the box; I was keeping a constant lookout ahead. Up at the crossings I saw lights which later turned out to be the markers of the caboose. I watched them all the way down. There was more curve than I had figured there was. I did not see the caboose lights to recognize them as caboose lights before I did. I could have seen them if I had known the track better; but those lights I saw I thought were getting too far away to the left *but I made a big mistake.* Ballard set the brakes up there at the double crossings; that was before he got to the yard limit board. It was about thirty car lengths when I told him to 'big hole' her. The cars are forty to fifty feet. Ballard was on the blind side of the curve and *could not see around there. I could see.* I lost the line of the track around there. Yes, I got confused. There was more curve there than I thought there was. I didn't think Ballard could see around the curve. Somewhere between the yard limit board and the double crossings Ballard released the air on his brakes, somewhere there between the places, I do not remember where. I did not tell Ballard to release the brakes. I did not pay any particular attention to Ballard releasing the brakes that night, not very much. I just noticed that he applied them, and we slowed down just a little bit. I have always heard that a train could stop in its length in emergency. The only thing I ever said to Ballard was to 'big hole' her; he applied. As soon as it slowed down and I saw it was going to hit her before we did get stopped I jumped off about three car lengths before it hit. I went away from there. Ballard blew his whistle about the whistle post—two long and two short. He blew at the double crossings; just before we got off the curve I think he blew again, there it was a succession of blows. I did not turn off the fire and did not cut off the oil. I noticed after the wreck that the fire had been turned off and the oil cut off. I did not get hurt. The last time I saw Ballard that night he was seated on his box on the right hand side of the cab looking ahead."

Defendant's witness Sears, the conductor testified: He testified in the investigation, the former trial, and this trial. "Both times I testified that as my train approach-ed the double crossings I thought it was running at restricted speed.

"Q. That is your testimony now? A. Yes sir, I thought he was at that time."

Counsel for the defendant railroad was permitted to ask Ballard over one hundred times to define "restricted speed":

"Q. What did the yard limit board mean to you? A. Meant to me reduce speed and run carefully.

"Q. Did you do that? A. Yes sir.

"Q. Mr. Ballard, after you entered the yard limits there at Hagerman, up until the time of the collision, state whether or not you were operating your train at restricted speed. A. *Yes sir, I was.*"

On cross examination Ballard testified again as to "restricted speed":

"Q. You say the yard limit board means reduced speed, to run carefully? A. Reduce your speed and run carefully.

"Q. Don't you know it means to run at restricted speed? A. To me it means reduce your speed and run carefully.

"Q. Didn't that yard limit board mean to run at restricted speed? A. It meant to run at reduced speed.

"Q. You don't like the word 'restricted', Mr. Ballard? A. I reduced the speed and ran carefully.

"Q. I said don't a yard limit board mean for you to run at restricted speed? A. Yes sir.

"Q. It did, didn't it? A. Yes sir.

"Q. *When you said reduce speed and run careful you were giving a definition of restricted speed, weren't you?* A. Yes sir."

After the witness had been questioned more than one hundred times as to "restricted speed", counsel on re-cross examination commenced asking over and over again the same questions. The court interposed saying, "I think it has been gone over a dozen times by the witness defining it." The court, nevertheless, permitted counsel to take the witness over the same line of questions again and again. Many of the questions were argumentative and erroneous.

The final answer of the plaintiff was that when he ran his engine into the yard limits and thereafter until the time of the collision he was running at restricted speed. No witness comes forward to dispute the evidence of the plaintiff, and the testimony of the fireman and the conductor corrobo-

rates his statements. Moreover, no witness disputed the evidence of Ballard as to within what distance his train could have been stopped.

The facts are simply these, we have an engineer deserted by his fireman; left by his brakeman. An engineer left to feel his way around a blind curve unaided; left to "bear the burden alone".

The jury considered the rules and the evidence and returned a verdict for the plaintiff. The reason for its verdict is not hard to find. The fireman riding on the left hand side of the engine cab admits that he was negligent; he admits that he failed to keep a proper lookout; he admits that he lost the line of the rails; and that his engineer could not see around the curve. It seems that the fireman completely forgot Rule 494 which provides that firemen "must assist in keeping a constant lookout upon the track, and must instantly give the engineer notice of any obstruction or signal they may perceive." The fireman did not obey this rule that night.

Ballard was not to stop his train at Hagerman. The fireman told him the way was clear and he had a right to and did rely on the fireman to tell him the truth. Under the facts and circumstances the fireman was the eyes of the engineer, and the engineer was, by necessity, compelled to rely upon him to watch the track and inform him of any obstructions. The rules provided that the fireman should see for the engineer on the blind curve that night, and the fireman admits that he sat on his box and failed to keep a proper lookout. I think it clear that the negligence of the fireman was the sole cause of the wreck.

All the evidence, charges, and exceptions as to rules 99 and 93 have no bearing on this case. If error was made as to them it was error without injury. We sit to do substantial justice and by statute and the Rules of Civil Procedure harmless error is not ground for reversal.

I am firm in my belief that the rule as to "restricted speed" is ambiguous. I think decision must turn upon this part of rule D-153: "Restricted speed. Proceed to stop short of train, obstruction or anything that may require the speed of the train to be reduced." To make this rule free of ambiguity it must be understandable and that without the necessity of explanation. Here is the acid test:

1. The writer of the majority opinion says that "the rule requiring an engineer to operate his train at restricted speed within yard limits, is, in the light of the definition in the rules not 'very indefinite', but most definite."

2. The writer of our former opinion says of this rule. "Further, the rule requiring an engineer to operate his train at restricted speed within yard limits is very indefinite. If the jury believed the testimony of the engineer they might have considered that he was not negligent in this respect." Opinion, 5 Cir., 100 F.2d page 164.

3. The conductor, Sears, who was on the train with Ballard, testified, "If you hit an automobile going at two miles per hour you would not be going at restricted speed. I do not take into consideration the element of time, time to stop."

4. The plaintiff, Ballard, testified, "To me restricted speed means reduce your speed and run careful."

5. To me this rule is not clear and self-explanatory. To know its meaning one should have expert testimony of railroad men to say what it means.

We have five expressions of opinion as to the meaning of "restricted speed". We do not agree as to the meaning of the rule. The rule is not free from ambiguity and its meaning was a question for the jury upon proper evidence. Louisville & N. R. Co. v. Jacobson, 218 Ala. 384, 118 So. 565, 569; 22 Corpus Juris p. 548, and note; Texas & N. O. R. v. Mortensen, 27 Tex.Civ.App. 106, 66 S.W. 99; Finnegan v. Missouri Pac. Ry. Co., 261 Mo. 481, 169 S.W. 969.

In the majority opinion it is stated, "What was decided on the former appeal was this; on all the evidence in the record the case was clearly one for the jury and it was error to direct a verdict for defendant. With that decision we are in full accord." The evidence on this appeal is substantially the same as the evidence on the former appeal, yet, after the above statement, the majority opinion proceeds to dismantle our former opinion which is and should be the law of this case.

The sole cause of the wreck was the negligence of the fireman. The court fully and fairly submitted the case to the jury and the rights of the defendant were in no way prejudiced. I think that substantial justice has been done and that the parties should not be put to the trouble and expense of another trial and, perhaps, another appeal.

The judgment should be affirmed. I respectfully dissent.