## SEAGRAVES v. WALLACE et al.

### No. 6813.

Circuit Court of Appeals, Fifth Circuit.
Feb. 20, 1934.

Rehearing Denied March 24, 1934.

164

See, also, 51 F.(2d) 143.

Clyde A. Sweeton and David T. Searls, both of Houston, Tex., and Jas. W. Wayman, of Galveston, Tex., for appellant.

S. J. Brooks, of San Antonio, Tex., Bryan F. Williams, of Galveston, Tex., and J. D. Williamson, of Waco, Tex., for appellees.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

In this suit at law the plaintiff, Wallace, sought by virtue of a contract which he made with Seagraves to recover the purchase price of 2,946½ shares of stock in Corpus Christi Gas Company and also the loss in market value of the bonds of the company due to a breach by Seagraves of certain promises in the contract touching the bonds. On the first trial Wallace recovered $56,673 as the balance of the price of the stock, but was adjudged to have no case touching the bonds. On appeal to this court, the judgment was affirmed so far as the stock was concerned, but reversed and remanded for further proceedings so far as the bonds were concerned. 41 F.(2d) 679. Seagraves paid up the affirmed judgment, and filed an amended answer touching the bonds, and on a trial by the court without a jury he was adjudged liable to pay to Wallace $373,633 as principal and interest due on a face value of $201,500 of bonds deposited in court, on payment of which the bonds were to be delivered to Seagraves; and a further sum of $70,849 as principal and interest due on the remaining bonds of face value $38,500 which had not been deposited, for which execution was to issue upon their deposit, the bonds to be de-livered to Seagraves on his paying the execution. Seagraves again appeals.

The contract sued on is set out in the former opinion. That opinion held that part of the contract relating to the bonds not to be an obligation of Corpus Christi Gas Company, which was not a party to the contract, but of Seagraves; that there was a valid consideration for his promises which he would have been in position to carry out had he paid for and taken over the stock that he agreed to buy; and finally that "the evidence showed the existence of rights of action based on breaches of that obligation which were not barred by limitation when the suit was brought." With no further indication of the exact liability, the case as to this branch was reversed for further proceedings. On such proceedings a liability of nearly one-half million dollars has been adjudged in the District Court; but it now seems that no liability exists at all. We are unwilling to be bound by the very general expressions in the former opinion about it. We recognize that, when a case is affirmed on appeal, there is res judicata, and no power exists after the term to alter the decision. Realty Acceptance Corporation v. Montgomery, 284 U. S. 547, 52 S. Ct. 215, 76 L. Ed. 476. Where, on a reversal, a mandate is issued requiring that a specific judgment be entered, there is also final adjudication. In re Dubuque & P. R. Co., 1 Wall. 69, 17 L. Ed. 514. A judgment of general reversal binds the lower court of course as to all that it rules, as being the law of the case. Sibbald v. United States, 12 Pet. 488, 9 L. Ed. 1167. But in the Appellate Court on a second appeal only the questions in terms discussed and decided are within that principle. Wolff Packing Co. v. Court of Industrial Relations, 267 U. S. 552, 45 S. Ct. 441, 69 L. Ed. 785. And even questions which are within the rule of the law of the case, though ordinarily not to be re-examined, are not beyond the power of review. Good practice only, and not jurisdiction, is involved. Messenger v. Anderson, 225 U. S. 436, 32 S. Ct. 739, 56 L. Ed. 1152; Southern R. Co. v. Clift, 260 U. S. 319, 43 S. Ct. 126, 67 L. Ed. 283. Because of this power of re-examination, a case controllingly reversed by a state Supreme Court must after a retrial be again carried to it before an appeal will lie to the United States Supreme Court. Great Western Telegraph Co. v. Burnham, 162 U. S. 339, 16 S. Ct. 850, 40 L. Ed. 991. An appellate court, so long as it has jurisdiction over the controversy, ought to have power to do justice according to law, and should be more

ready to correct its own previous error, if such clearly appears, than to correct the errors of the District Court. Justice is better than consistency. The court is not bound at the will of litigants to revise its previous holdings, but, when itself convinced that it should, it can. It may say not stare decisis but fiat justitia, ruat coelum. Johnson v. Cadillac Motor Car Co. (C. C. A.) 261 F. 878, 879, 8 A. L. R. 1023; Higgins v. California Prune & Apricot Grower (C. C. A.) 3 F.(2d) 896; Luminous Unit Co. v. Freeman-Sweet Co. (C. C. A.) 3 F.(2d) 577. In this case we accept the reasoned and definitely announced previous rulings that the promise is that of Seagraves and not of the company, that there was consideration for it, and that his own failure to take the stock and assume control ought not to shield him, and that the action is not wholly barred by limitation. We disagree to the generally expressed conclusion thereupon that Seagraves is liable in some amount.

What did Seagraves promise Wallace touching the bonds, and what under the circumstances was intended? Wallace alone testified in the trial. He was a lawyer and broker. He had sold the stocks and bonds of Corpus Christi Gas Company in Michigan, and himself owned a share of stock and $3,000 of bonds. The company, distributing manufactured gas and pressed by the competition with natural gas in Texas, sought to switch to natural gas, and in March, 1923, was enjoined by the city of Corpus Christi which, as afterwards developed, was about to put in its own natural gas plant, claiming that the company's franchise did not cover the distribution of natural gas. Interest on the company's bonds had been in default for five years. Its stock was valued at 25. Wallace, after conferring with and getting the authority of six fellow stockholders who also owned some bonds, arranged to sell their 2,946½ shares of stock at 25 to Seagraves, who controlled supplies of natural gas, they both believing that the company's franchise authorized distribution of such gas and that the city's injunction could be dissolved. Their very elaborate contract dated July 8, 1923, recites the existence of such a franchise and names as party of the first part Wallace "as agent of the owners of the capital stock of the Corpus Christi Gas Company mentioned above," that is, of the 2,946½ shares, being about 85 per cent. of the entire capital stock. There follow 16 paragraphs relating to the stock purchase and the installment payments therefor covering more than a year. The seventeenth paragraph is:

"That after the capital stock of the Corpus Christi Gas Company referred to above shall have been delivered to the party of the second part, and after he shall have assumed possession and control of the property of the said Corpus Christi Gas Company, that it will cause all taxes and assessments, ordinary and extraordinary, to be promptly paid each year," etc. The eighteenth is: "That after the party of the second part shall have made all payments hereunder and shall have received the capital stock of the Corpus Christi Gas Company purchased hereunder and shall have assumed the control and management of the business of the said Corpus Christi Gas Company, that it will immediately take all such steps as shall be necessary for the accomplishment of the following purposes": (1) To provide for the establishment and maintenance of a fund for payment of all semiannual bond interest coupons as the same shall fall due, beginning April 1, 1924; (2) to establish and maintain a fund for the purpose of paying off and retiring past-due interest coupons at the rate of two coupons per year; (3) to make provision for establishing with the bond trustee a sinking fund of at least 5 per centum of the face of the outstanding bonds each year, so as to pay them off at or before their maturity, which is in the year 1944.

The contract promises nothing else about the bonds. Wallace admits that he had no precedent authority to deal for other bondholders, and that no notice of his having done so was ever mailed out to them. He testifies only that he afterwards showed the contract to such bondholders as inquired at his office and that they approved of it. Neither the trustee nor any bondholders ever notified Seagraves that they would waive the default which existed, and would agree not to foreclose, or that any guaranty by him was relied on. The litigation with the city proved stubborn. Seagraves did not pay for the stock. The final decree in favor of the gas company was rendered in January, 1927; Wallace and his associates having been in control of the company meanwhile. The city had then established its own plant, and had all the business. The gas company's plant was worthless, and Wallace says its entire property would not now bring the unpaid taxes on it. On July 30, 1927, the bondholders formed and assigned their bonds to a protective committee, but the agreement therefor in all its lengthy recitals and provisions made no mention of any obligation by Seagraves to pay the bonds, but refers only to the company and its assets. Wallace brought

suit on the contract February 18, 1928, but only sought judgment for the purchase price of the stock, although he himself then owned $9,000 of the bonds which had not been deposited with the committee. ·A first amended petition was filed by him September 21, 1928, in which he joins three persons as bondholders having respectively $61,000, $10,000, and $10,000 of bonds, for which he asked judgment. He again made no claim in his own behalf. A second amended petition, filed December 14, 1928, brought in the bondholders' committee and enlarged the bond claim. In the third amended petition on which the trials have been had, filed April 25, 1929, Wallace professes to have represented all bondholders in making the agreement and in the suit, and in their behalf has now got a decree in which Seagraves is treated as having guaranteed all the bonds—he is to pay them and then to have them. We feel very sure that this is an afterthought, and ·that neither Wallace nor Seagraves so intended in contracting. Seagraves was·buying an interest in a lawsuit, cautiously and on long-time installments. He was not buying the entire capital stock. Why should he agree personally to pay over a quarter of a million dollars of the company's debts? Wallace was not representing the bondholders in making the contract. He had·no authority from them, and the contract itself recites that he was acting only for the owners of the 2,946½ shares of the capital stock. Though many of the bondholders afterwards knew of the contract, they did not suppose that they had any personal guaranty from Seagraves, because in forming their committee in 1927 this contract is not mentioned. Wallace did not deposit his bonds with this committee; but in suing Seagraves he did not claim that his own bonds were guaranteed by Seagraves, nor did he so claim in the first amended petition, where he sues in behalf of some other bondholders. Conceding that the contract is that of Seagraves, the words used do not purport to bind him personally to furnish the money to care for the bonds. His promise is that, after he buys the stock and thus comes into control of the corporation, *the corporation* will promptly pay its annual taxes and will set aside certain moneys for bond purposes. No one has ever sought to hold Seagraves for the accumulated taxes. As to them, and as to the bonds also, there is only a promise to use corporate assets in payment, not his own assets. He might be bound by these engagements to exhaust the company in his control, but not to exhaust himself. The company has in fact been exhausted while in the control of the promisee, Wallace. If the company's failure has been due to the mismanagement of Wallace, Seagraves ought not to suffer for it. If it was no one's fault and unavoidable, it would have happened if Seagraves had paid for the stock and had taken charge of the company. The inability of the company to pay its bonds was not caused by the failure of Seagraves to take charge. The stipulations about the bonds were not intended as a personal assumption of this vast debt by Seagraves, but were intended only to fix the corporate policy when Seagraves should get control, so that its finances would be put and kept in order. Because Seagraves had natural gas and the company did not, Wallace and his associates felt that the company stood a better chance of success in his hands, and they stipulated only for an orderly payment of their bonds out of the company's business. Under the arrangement thus made, the bonds were not due to be paid until 1944. Seagraves did not promise personally to assume to pay bonds or coupons at any time. The petition does not even claim that he did. Its theory is that by not keeping his promise about the bonds he destroyed their value; but we have shown that not the failure of Seagraves to take charge of the company and to appropriate its funds as agreed, but the failure of the company to have funds to be appropriated, is the main, if not the only, cause of the bondholders' losses.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.