Mrs. Wanda MERCER, Appellant,

v.

Paris THERIOT, Appellee.

No. 19068.

United States Court of Appeals
Fifth Circuit.

March 14, 1963.

Rehearing Denied May 9, 1963.

Rives, John R. Brown, Gewin and Griffin B. Bell, Circuit Judges, dissented.

# 636

H. Alva Brumfield, Baton Rouge, La., Sylvia Roberts, New Orleans, La., for appellant.

Stanley E. Loeb, New Orleans, La., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON, RIVES, CAMERON, JONES, BROWN, WISDOM, GEWIN, and BELL, Circuit Judges, En Banc.

WISDOM, Circuit Judge.

In the early hours of the morning of December 19, 1955, Willie B. Mercer's body was found face down on the side of Highway 1 on Grand Isle, Louisiana. The coroner's certificate shows that he died about 7:30 p. m. December 18. Tire marks leading to the body indicated that Mercer was run over while he was on the shoulder of the road. Around 7:30 p. m. on December 18 Paris Theriot, the defendant, had left Fisherman's Bar on Grand Isle, taking Highway 1 to return to his home in Golden Meadow. The chronology and the fact that he had been drinking in Fisherman's Bar since one o'clock pointed to Theriot. In addition, the investigating officers recalled that Theriot had run over and killed a pedestrian in each of two accidents twenty or twenty-five years ago. The police investigation disclosed that the right front fender of Theriot's automobile was dented and the rim of the right headlight missing. There was also a large dent on the hood of the car. Theriot gave two different explanations for the damage to his car: he said that he had run into a cow and he said that a four by six piece of lumber had dented the hood when he ran into a lumber truck. A deputy sheriff found a blue mark on the hood; Mercer had been wearing blue denim overalls. Another deputy found "hair-like substances" underneath the car, a towel bearing reddish stains, and a white powdery substance on the car that appeared to be soap powder from a recent carwashing. The officer took scrapings of the blue spot, the hair-like substances, and the white powder and placed these in envelopes. The envelopes, towel, and certain other articles were brought to the office of the Sheriff of Jefferson Parish and placed in the "evidence locker." This evidence disappeared before the trial and before any of it could be analyzed.

The decedent's wife brought a wrongful death action against Theriot resulting in a jury verdict in her favor for $25,000. On appeal, this Court, Judge Hutcheson presiding and writing the opinion for the Court, unanimously decided that the judgment should be reversed with directions to enter a verdict for the defendant. Theriot v. Mercer, 5 Cir., 1959, 262 F.2d 754; certiorari denied, 360 U.S. 914, 79 S.Ct. 1293, 3 L.Ed.2d 1263 (1959). The Court pointed out that highly prejudicial testimony, which should not have been admitted, and inflammatory trial tactics of the plaintiff's attorney had the effect of denying the defendant a fair trial.[1] The Court rested its decision on

---

[1] "In the light of the errors above referred to, if the evidence in the case had been ample to support the verdict and the verdict and judgment, but for the manner and way in which the case was tried, could stand, the judgment would have to be reversed for the errors which, dominating the trial, deprived the defendant of his day in court and caused his conviction, on rumor and hearsay, not of negligent fault but of bribery and corruption." (262 F.2d 754, 758.)

"We, therefore, agree with the appellee's statement on page 6 of her brief that, although the defendant denied making a pay-off or giving any political contribution to the sheriff in the sheriff's race that was going on at that time (and nobody gave testimony to the contrary), the jury nevertheless convicted Theriot of making such a pay-off. Indeed it was the admission of *this wholly inadmissible and highly prejudicial hearsay testimony*, the introduction of which should have caused a mistrial, which changed the case from a suit for damages into an inquisition into fraud and wrong doing in the sheriff's office, a matter which, in

insufficiency of the evidence to support the verdiet: there was a "complete absence of any evidence, circumstantial or otherwise, that Theriot's car struck the deceased or that Theriot was in anywise negligent". 262 F.2d at 759. Nevertheless, the Court felt that the plaintiff should be given an opportunity to better her presentation of the case by producing additional evidence—if she could—to justify a new trial. The mandate therefore directed the district court

> " * * * to enter a judgment for the defendant unless plaintiff, within a time and under conditions to be fixed by the district judge, makes a satisfactory showing that on another trial evidence of sufficient probative force to justify submission of the cause to the jury will be offered, in which event the judgment shall be for a new trial." Theriot v. Mercer, 262 F.2d 754, 761.

In accordance with the mandate, the trial court notified the plaintiff that judgment would be entered for the defendant unless she tendered sufficient evidence to justify submission of the cause to the jury. The plaintiff then filed a "motion for a new trial" and submitted as supporting evidence a report and certain depositions from police officers. The report was a statement from a safety engineer and accident analyst that, in his

opinion, the photographs and medical reports demonstrated that the damage to Theriot's car was caused by its impact with Mercer. The depositions showed some skullduggery in the sheriff's office with regard to the missing evidence and indicated also that some of the officers had heard that Theriot had purchased the missing headlight rim from someone who had found it at the scene of the accident. The district court denied the motion for a new trial. "The evidence", a minute entry states, "while persuasive, would be inadmissible in a new trial." Leaning over backwards to be fair, the Court granted a rehearing. On rehearing, the district judge stated from the bench that there was no question in his mind "that there was a denial of justice in this case" and no question in his "mind either that Paris Theriot killed this man", but he felt compelled to deny the motion on the ground that the evidence tendered was not competent, and that the plaintiff had not met the conditions for a new trial required by the mandate.[2] The plaintiff now appeals from this denial of the motion for a new trial.

On this second appeal the panel to which the case was assigned on its own motion invoked a hearing en banc. The Court en banc affirms the action below and dismisses the appeal.

the state of the evidence, had nothing to do with the case and could have had no effect on it except the unlawful one of depriving the defendant of a fair trial on the charge of negligence made but not proven." (262 F.2d at 757.)

2. The district court stated:
"[T]he Fifth Circuit ruled that there was not sufficient evidence to support the verdict. And that unless the Plaintiff was able to, on his motion for a new trial, to advance additional evidence which would make out a case for the Jury, the verdict for the Defendant should be granted. And after reviewing the new evidence which the Plaintiff provided, I felt that while the evidence was persuasive and it showed skullduggery in this case, that the sheriff's locker had been rifled and the evidence which was taken from Paris Theriot's car was destroyed so it couldn't be produced in his criminal

case or civil case involving this death, there was still no direct evidence. There was just talk among the deputies who were concerned with obtaining the evidence and who, unfortunately, were unable to get the evidence when they went to the locker to get it in order to bring it to the laboratory to have it examined. I felt that the evidence, as produced under the application for new trial, was not competent evidence. In other words, it would have violated the hearsay rule if admitted, and that is the basis on which I denied the application for a new trial.

"It is my view the Fifth Circuit did say that as tried originally there was not sufficient evidence. There is no doubt that it said that unless additional substantial evidence was presented on application for new trial, the verdict should be for the Defendant. That was the basis of my ruling."

## I.

■■ If the order now appealed from had indeed been an order denying a "motion for a new trial", as the plaintiff termed it, the order would be unappealable. Sobel v. Diatz, 1951, 88 U.S.App. D.C. 329, 189 F.2d 26; Bass v. B. & O. Terminal Co., 7 Cir., 1944, 142 F.2d 779, cert. den'd 323 U.S. 775, 65 S.Ct. 135, 89 L.Ed. 619. But the motion is not the motion for a new trial contemplated in Fed.R.Civ.P. 59. Such a motion "serve[s] the function of allowing a party to seek to have the trial court correct errors, both of fact and law, that [occur] in the trial of the action." 6 Moore's Federal Practice 59.03 (1961). An order for a new trial reopens the issues of an action for a new trial on the merits, in whole or in part, *before*, an appeal on the merits. Here, however, the plaintiff's motion served a different function. It was filed in direct response to the invitation in this Court's mandate that the plaintiff present new evidence. If the plaintiff had made "a satisfactory showing that on another trial evidence of sufficient probative force to justify submission of the cause to the jury [would] be offered," the plaintiff would have been entitled to a "judgment for a new trial." Denial of the motion was a final decision by the district court that the plaintiff had failed to meet the terms of the mandate. The Court therefore holds that in the circumstances of this case the denial of the motion was an appealable order.

## II.

■ The argument is made that since the district court entered judgment in compliance with the mandate on the former appeal, the judgment is not appealable. The contention is, that when judgment is entered after a new trial there is no question of jurisdiction to entertain a subsequent appeal; but when there has been no new trial, as in this case, the judgment entered is that of the appellate court itself and there is simply nothing from which to appeal. This rule has been consistently followed in this circuit. See Davis v. United States, 5 Cir., 1957, 244 F.2d 308; Amalgamated Assn. etc., v. Southern Bus Lines, Inc., 5 Cir., 1953, 201 F.2d 53; Seagraves v. Wallace, 5 Cir., 69 F.2d 163.

But the appellant is not appealing from a decree that is in effect the decree of the court issuing the mandate. The mandate left open the question of the sufficiency of the additional evidence to support a new trial; the order therefore adjudicated a subsequent issue not determined by the judgment which was the basis for the mandate. The appellant contends that the district court both misconstrued the mandate and was guilty of an abuse of judicial discretion in deciding the issue created by the mandate. An appeal lies, therefore, to review the action of the district court to determine whether it gave effect to the mandate. In re Sanford Fork & Tool Co., 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414; Metcalf v. City of Watertown, 1895, 7 Cir., 68 F. 859; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 1944, 7 Cir., 142 F.2d 549, cert. den'd 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

## III.

The second appeal does not require a reconsideration of the merits. The narrow questions before the Court en banc are whether the district court properly construed the mandate and whether the district court abused its discretion in holding that the plaintiff failed to meet the terms of the mandate, that is, failed to make a satisfactory showing that the *additional* evidence would justify submission of the case to the jury. Accordingly, it is unnecessary to consider the application of the "law of the case doctrine". See Lincoln National Life Insurance Company v. Roosth, 5 Cir., 1962, 306 F.2d 110.

A. This Court directed that a new trial be granted upon plaintiff's showing evidence of "sufficient probative force to justify submission of the cause to the jury." Instead, the appellant argues, the district judge adopted a different, more stringent requirement. He required that the evidence be "additional" and "direct".

■ We hold that the district judge properly construed the mandate. The mandate is meaningless unless it refers to "additional" evidence, for the former opinion holds that the evidence in the record was insufficient to support a verdict and judgment for the plaintiff. It is true that the district judge referred to the lack of new "direct" evidence but the basis for his holding was that the evidence offered was hearsay and incompetent, not that it was indirect and circumstantial.

The appellant argues also that a reading of the Court's first opinion shows the chief ground for reversal to have been counsel's inflammatory trial tactics. To overcome this, counsel argues, it is necessary only to have a new trial which, he assures us, can be had in an atmosphere free from all overtones of passion and prejudice. This proposed solution oversimplifies the problem. In its original opinion the Court severely condemned the trial tactics of the plaintiff's counsel and disapproved of the trial judge's admitting certain testimony that was irrelevant and prejudicial, but the court squarely held that the evidence was insufficient to support the verdict. The mandate looked to new probative evidence sufficient to justify a new trial, not to a new trial on counsel's promise to avoid improper tactics; otherwise, the Court would simply have remanded the case for trial.

B. Coming now to the sufficiency of the additional evidence to justify a new trial, we find ourselves in agreement with the district judge.

■ In support of his motion for a new trial the defendant offered ten depositions, seven from witnesses who had testified at the trial. Most of this "evidence" related to the missing headlight rim. The depositions show that up and down the bayou there were people who knew people who knew that there was a going price for the missing headlight rim. There were conflicting rumors that Prudhomme had the rim, or Verdon had the rim, or Guidry had the rim, or Nolte Theriot had the rim, and that the defendant had purchased it. But Prudhomme testified that he did not have the rim; someone had told him that Guidry had it and was holding it for $10,000. Guidry said he had heard that Theriot's son had the rim. Verdon denied having found the rim and denied that anybody told him that anyone had found the rim. Nolte Theriot said that he had had nothing to do with the rim. Gilbert Duet testified that a deputy sheriff "just passing through" had told him that he had heard that the rim had been found but he did not say who had found it. The depositions contain testimony of no higher degree of reliability relating to a "report" of a pay-off, presumably by Theriot, to some person (unknown) who destroyed the evidence in the Sheriff's "evidence locker". In short, the additional evidence was hearsay of the rankest sort. It lacked probative force because it was incompetent, not because it was indirect or circumstantial evidence.

The accident analyst's report adds little support to the plaintiff's cause. It is of doubtful admissibility because it comes close to taking over the jury's function of deciding ultimate facts. At best the report is merely cumulative.

The district judge correctly interpreted the mandate and correctly ruled that the additional evidence was of insufficient probative value to justify a new trial The judgment is

Affirmed.

RIVES, Circuit Judge (dissenting).

In my opinion, the most practical and effective safeguard of liberty and justice is the right of trial by jury. In the words of Patrick Henry, "Trial by jury is the best appendage of freedom." [1] I recognize that there are many eminent lawyers and judges who do not share that view, and that the right of trial by jury is subjected daily to every form of attack, direct and indirect. Such persistent and constant warfare makes it all the

1. 3 Elliotts Debates 324.

more necessary for the defenders of that right to bear in mind that, "Eternal vigilance is the price of liberty."

Whatever may be our differences of opinion as to the intrinsic merits or demerits of trial by jury, there can be no dissent from the proposition that we are each and all bound by the plain language of the Seventh Amendment, and that language bears repeating:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

With the utmost respect for and deference to the views of my brother judges, it is my duty to express my own considered judgment that this Court's decision both on the original appeal [2] and on this appeal is in direct contravention of the mandate of the Seventh Amendment.

A thorough reading and study of the evidence on the original trial leave me with a clear understanding and approval of the jury's verdict for the plaintiff. I can well appreciate the remark of the learned and experienced trial judge, Honorable J. Skelly Wright, made when he denied the defendant's motion for judgment notwithstanding the verdict: "No one who sat through this trial and heard the witnesses could reasonably come to any conclusion except the one the jury came to."

This Court's opinion to the contrary on first appeal did not convince Judge Wright, for in denying the plaintiff's later filed motion for new trial,[3] he said: "There isn't any question in my mind that there was a denial of justice in this case. There isn't any question in my mind either that Paris Theriot killed this man."

We deal here with a sorry mess where the evidence which might have established the defendant's guilt or innocence with certainty has been destroyed or irretrievably lost as the result of criminal misconduct on the part of someone. The remaining circumstantial evidence might not sustain a criminal prosecution and conviction of the defendant, but it is, I submit, amply sufficient to support a jury's verdict for the plaintiff in a civil action for damages.

The issues presented to the jury on the first trial, and found in favor of the plaintiff, were thus stated in the court's charge.

> "The issue here is very simple: Did the Defendant, Paris Theriot, kill Byrd Mercer? And, if so, was he guilty · of negligence in so doing, which proximately caused that death? That is the sole issue here, whether the Defendant killed Mercer, and if he did, was the death a result of negligence proximately caused by the Defendant Paris Theriot." (R. 1, p. 282.)[4]

In judging the sufficiency of the evidence to justify or support a verdict for the plaintiff, those issues can be narrowed to one; that is, was there substantial evidence from which the jury could reasonably conclude that the defendant, Paris Theriot, killed Byrd Mercer. That is true because the circumstantial evidence was overwhelming that Byrd Mercer was killed by some hit-and-run driver. Flight is evidence of guilt even in a criminal case, albeit the circumstances may be such as to make it weak evidence. Vick v. United States, 5 Cir., 1954, 216 F.2d 228, 233; see Wong Sun and James Wah Toy v. United States, 371 U.S. 471, 83

2. Theriot v. Mercer, 5 Cir., 1959, 262 F. 2d 754.

3. Though immaterial for present purposes, I do not agree with the majority statement that, "If the order now appealed from had indeed been an order denying a 'motion for a new trial', as the plaintiff termed it, the order would be un-

appealable." As one of the decisions to the contrary, I note that we reversed an order denying a motion for new trial in Whiteman v. Pitrie, 5 Cir., 1955, 220 F.2d 914.

4. I refer to the record on first trial as R. 1.

S.Ct. 407, 9 L.Ed.2d 441 footnote 10. In civil cases of this type, the rule has been well expressed as follows: "Every legitimate inference will be drawn against a hit-and-run driver, and an inference of an admission of negligence has been drawn against such a driver." 61 C.J.S. Motor Vehicles § 511(4), p. 212.

That the jury could reasonably conclude that a preponderance of the evidence proved that the defendant Paris Theriot killed Byrd Mercer is shown, I submit, by the following catalogue of the evidence. According to the death certificate Byrd Mercer died on Sunday evening, December 18, 1955 at 7:30 p. m. (R. 1, p. 28.) His body was found on the island, Grand Isle, on the right side of the road going toward the bridge leading to the mainland (R. 1, p. 37). The The body was two to three feet off the edge of the black top (R. 1, p. 45). Tire marks near his body ran off the road for quite a way, and his body was right next to the tire marks (R. 1, p. 85). An autopsy revealed evidences of a violent blow. " 'Fractured dislocation of atlanto-occipital joint with traumatic contusion of spinal cord; comminuted fracture of left tibia and fibula; partial separation of lambdoid suture of skull; rupture of spleen, liver, and both renal arteries; lacerations of scalp, face, right thigh, right hand and left leg.' " (R. 1, pp. 28, 29.)

The road was the only highway leading from Grand Isle to Golden Meadow, the home of the defendant, Paris Theriot (R. 1, p. 61). Theriot had spent that Sunday afternoon at "Fisherman's Bar" on Grand Isle from about 1:00 or 2:00 P.M. to about 7:30 or 7:45 P.M., when he had driven toward Golden Meadow over this same highway (R. 1, pp. 55, 151). During that period Theriot estimated that "I drank between four and five drinks, something like that" of Scotch whiskey (R. 1,

p. 56). The bartender's estimate of Theriot's drinks was: "To the best of my knowledge, I would say around eight or ten." (R. 1, p. 152.) That was scaled down from a statement in which he said that he had served Theriot "ten or fifteen Scotch and waters" (R. 1, p. 157).

At the time that Mercer was hit and killed, few people were traveling that highway.[5] Theriot admitted that between Fisherman's Bar and the location where Mercer's body was found he passed only one car, a truck (R. 1, pp. 180, 185). Another explanation for the fact that Mercer's body was not found until 6:30 A.M. on December 19th (R. 1, p. 28) is that the weather was rainy and foggy (R. 1, pp. 171, 184).

Suspicion fell on Theriot as soon as Mercer's body was found (R. 1, p. 87), and the officers quickly located Theriot's automobile, a 1955 or 1956 model Oldsmobile (R. 1, p. 88). It bore unmistakable evidence of a recent accident, a blow to the right headlight and right front of the hood extending back to the windshield. On the cream or white colored hood was some blue coloring; "it had an appearance that it could have been done by clothing, since it was porouslike" (R. 1, pp. 108, 230). Mercer was wearing blue coveralls when struck (R. 1, pp. 85, 104). The rim of the headlight was missing (R. 1, p. 102). A medium size bath towel with red stains on it which appeared to be blood (R. 1, p. 116) was found concealed between the seat and the seat cover on the driver's side of the front seat (R. 1, pp. 141, 146). On the chasis underneath the car on the right front side were found hair particles or what looked like hair (R. 1, pp. 40, 46, 93, 122, 140, 160).[6]

When confronted by the officers with the evidence that his automobile had been involved in a recent accident, Theriot readily admitted that that was true, and

5. "Well, there was, on a Sunday like that, the tourists, but usually they leave early —I mean in the afternoon, so at that time, during the night, there's not too many people, but there was a few people on and off during the afternoon, the people at the bar coming in and out." (R. 1, p. 156.)

6. As has been repeatedly said, verification of these findings became impossible when the samples taken by the officers disappeared from the files.

fixed the time of the accident as noon or 12:15 on the same Sunday on which Mercer was killed (R. 1, pp. 72, 73) and the place as six or seven miles up the bayou from Golden Meadow (R. 1, p. 73). He said that he had tried to pass a truck in front of him and "I hit the back of the truck with my right side of the car" (R. 1, p. 73). In Theriot's own language: "I just told you that I was coming, that I was going up the bayou, and I was looking aside when I noticed the truck in front. I tried to pass him on the side, and when I tried to pass him he pulled a little bit on the left, and I hit him right in the back, the piece underneath of the truck body, the body of the truck—it is a 2 or 3 x 10, or 3 x 12 sticking out, two pieces like that (indicating with hands), and you've got the body of your truck right on that, and I hit the back part with the top of my headlight, in front. I put my brakes on, and when I saw it, I put the brakes on and I slid on the road and I go off of the road, and I came back slowly, and I just make it. I came back slowly on top, on the road there, and it was gone, I guess, off, and I looked at my car and I saw that it was not too much, and I looked in the back over there and I saw a piece of wood about that long, 26 or 30 inches (indicating with hands) long, and maybe a 6 x 6 or 6 x 8, and I threw it on the side of the road, and I turned back and I went right straight to Grand Isle. That's exactly the way that happened." (R. 1, p. 75) See also R. 1, pp. 211, 162, 96. Theriot further testified: "The truck didn't stop—he kept on going. I couldn't check up on it." (R. 1, p. 76). It seems to me that the probability or improbability of the truthfulness of that explanation presented a question for the jury.

That is especially true in the light of the testimony of Trooper Folse of the Louisiana State Police:

"Q. Isn't it also true that the car tracks of the vehicle, the vehicle, tracks that you saw there did not careen back to the right and get back on the highway?

"A. According to the point where Mr. Theriot brought us, the car, if it swerved over to the left, did not come back to the right any time after it left the highway, if those are the marks.

"Q. In fact, whatever vehicle was in that place where you saw, it had to be pulled out, didn't it?

"A. I would say that if it was soggy and wet, it had to be pulled out.

"Q. You say if it was soggy and wet? Was it?

"A. It was wet." (R. 1, p. 226.)

To Deputy Sheriffs Milliet and Guidry, the defendant Theriot gave an entirely different explanation of the recent accident to his automobile, namely that he had hit a cow (R. 1, pp. 117 and 138).

The defendant Theriot testified that nothing had been done to his car between the time of the accident on Sunday and of its inspection on Monday (R. 1, p. 66). However, the officers found the car covered with a white substance which appeared to be a film of soap left after a washing (R. 1, pp. 109, 116).

Effective December 31, after the accident on December 18, the defendant Theriot sold his business to his brother (R. 1, p. 51).

The circumstances are so numerous that some may have been unintentionally omitted. Those which I have recited, with references to record pages, seem to me ample to require the submission of this case to the jury.

In Lincoln National Life Insurance Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110, 113, we held that, "when the issue resolves itself, as it does so clearly here, into a question of whether the same body of evidence is enough to permit a jury submission, neither a subsequent, second, or third, panel of this Court, nor the whole Court sitting en banc, should *ordinarily* undertake to review the correctness of the first decision or, doing so, arrive at a contrary conclusion." (Emphasis sup-

plied.) In that case the first decision had reversed a judgment n. o. v. and remanded the case for a new trial. Upon the second appeal we affirmed the judgment entered upon the jury's verdict on new trial. Our added reluctance in that case to depart from the law of the case was, therefore, not inconsistent with the mandate of the Seventh Amendment. There is such an inconsistency in the present case, and the constitutional mandate should prevail. In addition, I have emphasized the word "ordinarily" in the quotation from Roosth. The present case seems to me not an "ordinary" one, not even a "close" case, but one where the circumstantial evidence very clearly requires a submission of the issues for the jury's determination.

Assuming, however, that Roosth would require us to affirm the judgment of the district court in the absence of additional evidence, surely, with circumstantial evidence already of such weight, very little additional evidence would be needed to meet the requirement of our mandate; that is, that the evidence as a whole be of "sufficient probative force to justify submission of the cause to the jury." I think that the additional evidence was sufficient to justify a new trial.

It is true that most of the proffered additional testimony was rank hearsay developed in a fruitless effort to trace the lost items of evidence and particularly the rim off the right headlight of the defendant Theriot's Oldsmobile. However, the deposition of a witness not examined on the first trial, Benny Verdon, discloses that he was among the first to reach the body of the deceased shortly after daybreak (p. 21, Verdon's Deposition), and furnishes positive evidence that Mercer was struck and run over by an automobile:

"Q. You just saw the tire marks that ran right off on the shoulder and right on his body and proceeded on down the road?

"A. That's right.

"Q. There was not any question about him being run over by an automobile?

"A. Oh, yes, he was run over by an automobile.

"Q. The evidence showed that?

"A. You could tell it.

"Q. It looked like he was hit in the back and run right over?

"A. Yes, sir.

"Q. And the mark of the tire of the car that did it was plainly visible on his shoulder there?

"A. Yes, sir." (p. 29, Verdon's Deposition.)

A copy of the report of the safety engineer and accident analyst that, in his opinion, the photographs and medical reports demonstrated that the damage to Theriot's car was caused by its impact with Mercer is attached as Appendix A to this dissenting opinion. On the first trial, the district court had refused to let the law officer witnesses testify as to their opinion of whether the type of indentation on the car was made by a soft or a hard object, on the ground that such testimony was "too speculative" (R. 1, p. 44) or that the witness was not qualified as an expert (R. 1, p. 110, see also R. 1, pp. 90–91). The proffered testimony of the safety engineer and accident analyst was therefore not cumulative. Coming from an expert, that testimony, or most of it, was admissible.

"A large class of cases, embracing statements as to the *probability* or the possibility of an event, the *capacity* or tendency of an act or a machine, the *cause* or the *effect* of a fact, may fairly be grouped together, because the reason why the Opinion rule is urged against them is in general that the thing to which the witness testifies is not anything which he has observed, but is a quantity which lies in estimate only and is the result of a balancing of concrete data.

"This is no sufficient reason for excluding such statements from qualified witnesses; because it must almost always be impossible for a witness to reproduce in words absolutely all the detailed data which enter into his estimate, and there can be no danger in receiving such an estimate from him. All that can be said of the rulings is that probably some of them, in the final result of the litigation in hand, have done less actual harm to justice than others have done." VII Wigmore on Evidence, 3rd ed., § 1976, p. 121.

To repeat, if any evidence were needed to weight the scales in favor of sufficiency to justify submission of the issues to the jury, such evidence need be very slight. In my opinion, the deposition of Benny Verdon and the testimony of the safety engineer and accident analyst are enough.

I would accord the plaintiff what I believe to be her constitutional right to a trial by jury, and therefore respectfully dissent.

### APPENDIX A

### "ACCIDENT ANALYSIS LABORATORY

Eight-Eleven North Virginia
Oklahoma City 6, Oklahoma
May 16, 1959
"Ralph H. Snyder

Phone CEntral 2–1830
Post Office Box 3855
"Mr. H. Alva Brumfield
Attorney at Law
205 American Bank Building
Baton Rouge, Louisiana

"Re: Mercer vs. Theriot
"Dear Mr. Brumfield:

"I have made a very careful study and analysis of this case, based on the physical evidence as shown in the photographs of the damaged Oldsmobile automobile, the post mortem report showing the injuries to the deceased and the photographs taken at the scene of the accident before the deceased was removed.

"As I understand this case, the main issue is whether or not the damage to the Olds. automobile was caused by collision with the rear of a flat bed truck, or hitting the pedestrian.

"A very minute examination of the damage to the Olds. discloses the following facts:

"1. The initial blow or force which caused the downward bend in the right front headlamp, came from the front and slightly to the right. Due to the top overhang of the headlamp rim, the top portion of the headlamp received most of the blow. This caused the headlamp assembly to tilt upward and backward, yet there is no visable (sic) dents or damage to the black plate rim around the headlamp and also the lens.

"2. The two inward dents in the right side of the fender located above the right front wheel were caused by the blow or force coming from the front and not from any side blow.

"3. The damage to the hood and fender located on the top right side and back toward the windshield, were caused by a blow coming from above, and an object large enough to cover the damaged area. The indentation in the hood was enough to bend up the corner of the hood approx. ½ inch.

"4. While there appears to be colored streaks extending along the top of the fender from the damaged area backwards, there is no indication of scratches or indentations between the front and rear damaged areas.

"5. An examination of the ridge of the right front bumper where it bends to the rear shows that this edge came into contact with some object which cleaned or wiped off the road grime and dirt. This is very evident when the photos are examined under a high power magnifying lens.

"It is my understanding that the defendant claims that the car was damaged when he started around a flat bed truck and as he started around, the truck started to make a left turn or to swing to its left and the right front fender struck the

left rear supporting joint of the truck. And that the blow was of enough force for a piece of wood (3″ x 6″ x 30″) (approximate) to be knocked off the truck (I believe it was supposed to have been laying loose on the bed of the truck and not a portion of the truck bed or support) and that it was this piece of wood which came down on the rear of the hood and fender to cause the damage in that area.

"I can find no mention made regarding the finding of the chromium headlamp rim. The type and extent of damage to this rim would be one of the most important bits of evidence, as it would clearly show the fact of the hardness of the object hit. The contact damage against the wood or metal of the truck bed would be entirely different than the damage made by striking a human or an animal.

"ANALYSIS AND CONCLUSIONS:

All of the physical evidence relative to the damage to the Olds. indicates that for this damage to have been caused by collision with the rear of a truck as described by the defendant would not be possible.

"1. While it is possible for the damage to the fender just behind the headlamp to be caused by the car running into the joist on the truck, the amount of force necessary to bend the fender to the extent shown in the photos and also cause the fender to bend on the side area above the front wheel, the striking force against the truck joist by the headlamp rim would extend through the light chromium rim and would also bend the back plate. The back plate shows no bends. It would also break the headlamp glass. The glass is not broken.

"2. The blue streaks extending back along the top of the fender and also found in the area of the dented area at the rear of the hood could only get there if the truck had scraped the top of the fender by the fender going on underneath the truck to the left of the joist. The fender top shows no scraping or denting, just a discoloration. This could not be possible if the fender went under the truck bed. The height of all truck beds (even the large trailer units) are too low to permit the front of an automobile to go underneath without bending and scraping. On most trucks the height is 2 to 3 inches lower.

"3. If the front right fender hit the truck joist and slid under, then there would be damage to the right side of the fender caused by further contact with the joist, which is approx. 6 in. in height and extends below the truck bed for that distance.

"4. The damaged area at the rear of the hood extends from the metal ridge which extends from the front ornament back to the edge of the hood, and also several inches into the top of the fender. This damage could not have been caused by the initial impact with the front of the fender striking the truck (the front of the hood shows no impact damage), nor could it have been caused by the piece of wood, as described by the defendant, being knocked from the truck, going up into the air and coming down on the hood and fender. In the first place the impact force would not be of enough weight and would not have enough force to bend the hood and fender to the depth, width, and extent as shown in the photographs.

"5. The 'cleaned' area along the ridge of the front bumper could be explained as being caused by contact with the wheel flap or even the left rear wheel of the truck as the car came underneath the bed. Again, this would not be possible as the bumper would have to penetrate at least a foot or so underneath the truck bed for the bumper to contact the wheel and this would leave damage to the top of the fender, which is not present.

"6. The physical damage to this car could not have been caused by collision with the rear of a truck such as described by the defendant.

"In my opinion, this damage was caused by striking the pedestrian.

"1. The 'cleaned' area on the edge of the right front bumper was caused when the bumper struck the man's left leg. His tibia and fibula were fractured and

if he was walking with his back to the car this would be the first striking point.

"2. The damage to the headlamp rim and fender was caused when the car struck this man in the back. His post mortem report shows a ruptured spleen, renal arteries, etc., which would be the area struck by the headlamp and fender.

"3. The area of damage at the rear of the hood was caused by the head and shoulders of the man striking as his body was flipped upward and backward. It would require the weight and force of an adult to bend the hood and fender to the width and depth if (sic) was bent.

"4. None of the photographs are clear enough nor taken close enough for me to determine the type of discoloration left along the top of the fender and hood. From the description of the investigating officers' report, they described it as being 'blue in color and of a porous texture, like made from a cloth.' Such a discoloration could not be made by contact with the truck but could be from contact with the clothes of the deceased.

"5. Mention is made of finding what appeared to be 'human hairs' caught in the steering arm underneath the car. I do not give any weight to the fact that these would be hairs from the deceased, as there is no evidence that the car passed over his body. The body shows no tire marks and if the body was hit, thrown up and backward, striking at the back of the hood and then off the car, the front of the car would not have passed over his body unless the driver backed over the body or turned around and drove over the body. This is most unlikely.

"6. Other factors which are difficult to understand if the truck was hit by this car is with this amount of damage, would the defendant drive off without getting the truck driver's name and the license number for either trying to collect from the truck's insurance carrier or his own for repairs. Also, no mention was made of bringing in the piece of wood for evidence, nor if it was also blue in color. Where did the headlamp rim go?

"In making this analysis I have to be as unbiased as possible in reaching my conclusions. However, the physical evidence is so clearly definite in proof that the damage to the Olds. automobile could not have been made by contact with the rear of a truck as described by the defendant, it leaves no recourse but to find that the damage could have been caused by striking a pedestrian and that it is most likely that this is the car which struck the deceased.

"Very truly yours,
(Signed) RALPH SNYDER
Ralph H. Snyder
Safety Engineer &
Accident Analyst.

"RHS:ms
Encls:
13 photos"

JOHN R. BROWN, Circuit Judge (dissenting).

The question for review is whether, on the proceedings pursuant to our remand, the evidence of the total record was sufficient to raise a jury question. This is so because it was implicit in our remand that the District Judge was to consider not only whatever additional showing was made, but to consider it in the light of and as a part of the total record. If the evidence was sufficient to raise a jury question, then it was incumbent on the District Judge to grant a new trial. We did not mean to accord to the District Judge any discretion in determining that legal question. Whiteman v. Pitrie, 5 Cir., 1955, 220 F.2d 914; Kirby Lumber Corporation v. Laird, 5 Cir., 1956, 231 F.2d 812, 816. For all of the reasons so ably set forth by Judge Rives, the evidence was more than ample to compel a jury trial as a matter of law. Because of the unique nature of our remand, we are not on this appeal now faced with the Roosth problem or the desirability (or necessity) of modifying it.

GEWIN, Circuit Judge (dissenting).
Believing that there is sufficient evidence to require a submission of the

factual issues in this case to a jury for decision, I join in the dissent of Judge RIVES.

GRIFFIN B. BELL, Circuit Judge (dissenting).

I join in the dissent of Judge RIVES with the following additional statement. My view in this case, as in Lincoln National Life Insurance Company v. Roosth, 5 Cir., 1962, 306 F.2d 110, is based on the sufficiency of the evidence. I feel that the evidence, at least on the second hearing of this case was sufficient to make a jury issue. I felt that the evidence was insufficient in Lincoln National. The losing party there, as must be implicit here, suffered the misfortune of being caught up in the law of the case doctrine. But here that doctrine should play no part as there was sufficient additional evidence over what was presented on the first trial to take the case to the jury.